[No. B159689. Second Dist., Div. Seven. Feb. 24, 2004.]

REBECCA ANNAMARIE RITCHIE, Plaintiff and Respondent, v.
MARK KONRAD, Defendant and Appellant.

COUNSEL

Law Offices of Daniel Ritkes and Daniel Ritkes for Defendant and Appellant.

Law Offices of Pauline Y. Robins, Pauline Y. Robins; Frandzel Robins Bloom & Csato and Thomas M. Robins III for Plaintiff and Respondent.

OPINION

**JOHNSON, J.**—In this case of first impression we consider the criteria a trial court should apply in deciding whether to renew a domestic violence protective order. We conclude the trial court should grant a requested extension unless the request is contested and the judge determines the protected party does *not* entertain a *"reasonable* apprehension" of future abusive conduct. (As the relevant statute makes clear, it is unnecessary, however, to find any abuse has occurred since issuance of the initial protective order.) Because the trial court granted the renewal in this contested case on the assumption petitioner was entitled to that order "just upon request," we reverse and remand for a reconsideration of the decision to grant a permanent extension of this protective order.

## FACTS AND PROCEEDINGS BELOW

In 1994 respondent Rebecca Annamarie Ritchie and appellant Mark Konrad began dating. In 1995 they started living together and became engaged. The engagement lasted until early 1998. According to Ritchie's allegations in her initial 1999 protective order action, during the final stages of that engagement there were frequent arguments. Then on one occasion Konrad grabbed her arm and slammed the car door. Shortly thereafter, she moved out and told him not to contact her ever again. Over the next few months, however, he sent a barrage of e-mails and letters, telephoned her repeatedly at her office, and the like. He also repeatedly phoned and sent e-mails to Ritchie's father. This conduct allegedly forced Ritchie to resign and take a new position. But Konrad located her at the new job and renewed the phone calls and e-mails. He also filed two allegedly frivolous lawsuits in small claims court.

In early 1999, Ritchie's new employer wrote Konrad and told him to cease contacting Ritchie at work. Konrad responded by coming to that office and threatening the chief financial officer with a harassment lawsuit. About that time someone vandalized Ritchie's car when it was parked outside her office building.

Again according to the allegations in the original petition seeking the protective order, Konrad's actions caused her nightmares about violence, and she could not keep food down and lost eight pounds.

Finally, Ritchie petitioned the court for a protective order. On May 7, 1999, the court issued a domestic violence restraining order against Konrad with a duration of three years. After hearing evidence from both parties, the trial court explained the reason for the order.

"The case, I mean, I really didn't need the evidence—well, I guess it was of some help, but a relationship breaks up, plaintiff leaves, she wants to be left alone, she doesn't tell the other side where she's at, and then the attempt is made by the other side; that is, by the defendant, who wants to contact her, starts going to areas that he knows, place of work, relatives, all that kind of stuff. When those seem to be closing down, then there is an attempted use of economics, power. It doesn't work but it was certainly used.

"This is clearly a situation where she doesn't want contact. I think these acts alone; that is, the repeated act of contact, is sufficient for a harassment order. Indeed, this is the very type of case that the Legislature heard evidence on when they enacted the harassment section.

"I will grant the restraining order. Standard restraint on personal conduct. Stay 300 yards away from the plaintiff's residence, place of work, and the residence and place of work of the protected person named in the petition.

"I don't think I have any evidence on damages, so that is denied without prejudice.

"There is also no evidence on fees."

During the following three years Konrad made no attempt to contact Ritchie. Both of them married other people and Ritchie moved with her new husband to Henderson, Nevada, near Las Vegas, while Konrad remained in the Los Angeles area.

On May 16, 2002, Ritchie filed a "request" that the three-year restraining order be made permanent, pursuant to California Family Code section 6345.[1] At the hearing on Ritchie's "request" the trial court began by noting "the renewal statute doesn't give a criteria . . . . It doesn't say it's automatic. The issue is what kind of burden it puts on the other side. The only burden I see is the firearm one." [This referred to the fact a protective order of this nature prohibits the restrained party from owning, possessing, etc. a firearm of any kind.]

Then the court asked the parties, "What criteria should I use?" Konrad's counsel tendered two factors based on some Missouri appellate cases. Those

---

[1] See page 1281, *post*, for text of this code section. All further statutory references are to the California Family Code, unless otherwise indicated.

cases hold a protective order cannot be renewed without a finding of an "imminent danger of abuse" and a finding whether "the circumstances [are] the same or [they are] different. Those are the factors that you weigh." After rejecting the Missouri cases as based on a different statute, the court observed, "In other words, nobody—no one's got a good defined series of factors I should be looking at to renew."

After hearing Ritchie's counsel respond to the same question with a mere rehearsal of Konrad's former abusive acts, the court commented, "That's not telling me what factors I should be using as to whether to exercise discretion. Obviously one is detriment to the restrained side. I said the only detriment he can point to is the firearms order and that can be done by striking that . . . order."

Counsel for the two parties then argued for several minutes. Konrad's counsel first urged Ritchie had failed to produce evidence her subjective concerns had any reasonable basis. He further argued the circumstances had changed in ways that dramatically reduced the danger of renewed abusive conduct. Ritchie's counsel, in turn, emphasized section 6345 said nothing about requiring a showing of "imminent danger" and anyway "the imminent danger is, if it's lifted he'll go back to doing the same thing."

Finally, the court interrupted: "Counsel, I'm gonna—the way I think I've got to read this statute is that I think you're entitled to have the renewal unless there is some reason blocking you, and the only detriment that I see is the firearm restriction, which I'm going to vacate, and I'm going to continue the order on a permanent basis. I've given you the basis for it. If you want to take it up, it's there."

Moments later, Konrad's counsel started to request a clarification: "So the sole reason you give for extending it—" To which the court replied: "I think they're entitled to it *just upon request.*"[2]

Konrad took the trial judge up on his invitation and filed an appeal in this court.

## DISCUSSION

In 1995 the Legislature amended section 6345. The previous version did not authorize permanent orders except upon stipulation of both parties and required a motion or stipulation to extend an order for any fixed

---

[2] Italics added.

period beyond three years.[3] The 1995 amendment gave the trial court discretion to extend the common protective orders (such as issued in this case) an additional three years or even permanently upon "request" of a single party, subject to termination or modification pursuant to a later stipulation by both parties or a motion filed by one party. The amended code section also specifically authorized such an extension "without a showing of any further abuse since the issuance of the original order."[4]

In this case, Ritchie filed a "request" the trial court make the previous three-year order permanent and the court complied, although it purported to strike the firearm restriction which had prevented Konrad from owning or possessing any firearm. Konrad objects due process requires the protected party accompany its "request" with evidence demonstrating an "imminent and present danger of *physical* abuse" unless the protective order is extended or submit proof the conditions necessitating the original order had *not* changed. In this case, Konrad argues, Ritchie failed to make such a showing and thus the trial court was not authorized to grant her request for an extension of the protective order. Furthermore, he contends the trial court's effort to lift the main burden the extended order imposed on him—the firearms restriction—was ineffectual. Consequently, at a minimum, the "request" should be remanded to the trial court so that court can reweigh Konrad's continuing burden against the continuing value of a permanent protective order.

■ We ultimately conclude we are compelled to reverse the order renewing the protective order and remand for reconsideration of Ritchie's "request." As explained below, because the restrained party appeared and challenged the requested extension the trial court erred when it issued the renewal order based solely on Ritchie's subjective desire the protective order be extended. Instead the court should have considered evidence tendered by both sides and determined whether Ritchie's expressed fear of future abuse was genuine and also reasonable. Furthermore, as independent and sufficient grounds for reversal, we conclude the court lacked statutory authority to eliminate the firearm restriction and remand for the judge to reweigh the risks and burdens of renewal with the firearm restriction intact.

---

[3] "(a) In the discretion of the court, an order issued after notice and a hearing under this article may have a duration of not more than three years, unless otherwise terminated or extended by further order of the court either on written stipulation filed with the court or on the motion of a party. [¶] (b) The failure to state the expiration date on the face of the form creates an order with a duration of three years from the date of issuance. [¶] (c) Nothing in this section prohibits parties, by written stipulation, from creating an order with a permanent duration." Former section 6345 (Amended by Stats. 1995, ch. 907, § 2, pp. 6907–6908.)

[4] The text of the amended section 6345 is quoted in the body of this opinion at page 1283, *post.*

## I. *RENEWAL OF A DOMESTIC RELATIONS PROTECTIVE ORDER REQUIRES A FINDING THERE IS A "REASONABLE APPREHENSION OF FUTURE ABUSE" IF THE INITIAL ORDER EXPIRES.*

Konrad raises what are necessarily issues of first impression in California, because at this point no published California appellate court opinion has interpreted any part of section 6345. Consequently, we begin with the statutory text. Section 6345 reads in pertinent part: "(a) *In the discretion of the court*, the personal conduct, stay-away, and residence exclusion orders contained in a court order issued after notice and a hearing under this article may have a duration of not more than three years, subject to termination or modification by further order of the court either on written stipulation filed with the court or on the motion of a party. These orders *may* be renewed, upon the *request of a party*, either for three years or permanently, *without a showing of any further abuse* since the issuance of the original order, subject to termination or modification by further order of the court either on written stipulation filed with the court or on the motion of a party.

"(b) Notwithstanding subdivision (a), the duration of any orders, other than the protective orders described in subdivision (a), that are also contained in a court order issued after notice and a hearing under this article, including, but not limited to, orders for custody, visitation, support, and disposition of property, shall be governed by the law relating to those specific subjects." (Italics added.)[5]

From the trial court's remarks at the hearing on Ritchie's "request" for a permanent extension of the protective order it is apparent the court considered Ritchie was entitled to such an extension without a showing of any kind. The court evidently read the statute to mean a party is *entitled* to an extension of the original order—even a permanent extension—if he or she files a request for this relief. Indeed as the exchanges quoted above from the hearing reveal, when Konrad's counsel asked the basis of the trial court's extension order, the judge replied: "I think they're entitled to it *just upon request.*" Konrad's counsel then sought to restate his understanding of the trial court's interpretation of section 6345, subdivision(a). "They are entitled to it upon request and the burden is on the responding party to show it's onerous—" To which the court responded. "No. They have *the burden of making the request.* They have done that. I find the only detriment on your part is the potential firearms restriction and I am striking this provision from the order."

---

[5] Section 6345, subdivision (c) merely provides the termination date will be three years where the court fails to state a specific expiration date on the face of the applicable form.

██ In this court's view, a protected party such as Ms. Ritchie indeed would be entitled to a renewal of the protective order merely upon request, if that request were not contested by the restrained party. In that instance, both the protected party and the court are entitled to assume the restrained party has a good reason for not objecting. It could be because of indifference to a continuance of the protective order. Or it could result from a realization there are no grounds to resist that continuation. In any event, section 6345 allows the restrained party to move for termination of the order at any time after it is renewed. Hence, he (or she) can file such a motion if the failure to contest the requested renewal was a mistake—or if the reason for not resisting should disappear.

(3) On the other hand, if the restrained party does contest the renewal, as Konrad did here, we conclude the protected party is not entitled to a renewal merely because she (or he) desires one. Section 6345 does not provide the trial court *shall* automatically renew the existing protective order if the protected party *requests*. By its terms, section 6345 only states the trial court *may* do so in the proper exercise of its discretion. In this court's view, that exercise of discretion requires an inquiry beyond whether the protected party requested a renewal and entertains a subjective desire the protective order continue.

True, section 6345 makes it unnecessary for the protected party to introduce or the court to consider actual acts of abuse the restrained party committed after the original order went into effect. It would be anomalous to require the protected party to prove further abuse occurred in order to justify renewal of that original order. If this were the standard, the protected party would have to demonstrate the initial order had proved ineffectual in halting the restrained party's abusive conduct just to obtain an extension of that ineffectual order. Indeed the fact a protective order has proved effective is a good reason for seeking its renewal.

But this does not suggest the trial court need make no finding beyond the petitioning party's subjective desire to have the existing protective order extended—in this case for a lifetime. As Konrad points out, a protective order imposes costs and penalties on the restrained party—the stigma (which may have practical consequences for employment and elsewhere in life) and, for those with reasons to own or use firearms in their profession or for protection or just for sport, there is the automatic firearm relinquishment requirement to be discussed in part II of this opinion. The fact a judge found enough grounds to grant a protective order three years earlier does not necessarily mean sufficient grounds remain to renew that order for another three years—or as in this instance, permanently—merely because the protected party files a "request" and expresses her subjective desire the court issue such an extension.

But what showing should be required before a trial court can extend an existing protective order? Konrad urges this court to adopt the test announced by appellate courts in Missouri. "To obtain a *renewal* of a full order of protection, the petitioner has the burden of proving by a preponderance of the evidence that the expiration of the full order *would place the petitioner in an imminent and present danger of abuse.* No new acts need be alleged. A renewal of a full order of protection *can be based upon the fact that the circumstances which formed the basis for the initial order continue to exist.*"[6]

## A. The Rationale of the Missouri "Imminent and Present Danger of Abuse" Standard.

Similar to section 6345, the Missouri statute specifically authorizes a court to renew an initial protective order, but fails to specifically define the showing required to justify that renewal.[7] Also, similar to section 6345, the Missouri statute provides, "a finding by the court of a subsequent act of abuse is not required for a renewal order of protection."[8] The same statute, however, does define what the trial court must find in order to issue the initial protective order. "[I]f the petitioner has proved the allegation of abuse or stalking by a preponderance of the evidence, the court shall issue a full order of protection [for a period of 180 days to one year]."[9] (The Missouri statute also differs in limiting an extension to a maximum period of one year.)

In 1986, a Missouri appellate court had occasion to interpret the renewal provisions of the above protective order statute in an unusual context. The question in *Capps v. Capps (Capps)*[10] was whether the renewal motion was a new "civil action" entitling the husband to demand a different judge for the hearing. In concluding a renewal proceeding was only a continuation of the original action seeking a protective order, the court relied on the legislative history behind that state's "Adult Abuse Act," of which the protective order proceedings are a part.

"The legislature intended the Adult Abuse Act to provide protection from further acts of abuse. A means toward that end is the renewal of a Full Order of Protection.

---

[6] *Bandelier v. Bandelier* (Mo.Ct.App. 1988) 757 S.W. 2d 281, 283. (Italics added.)

[7] The pertinent language reads: "Upon motion by the petitioner, and after a hearing by the court, the full order of protection may be renewed for a period of time the court deems appropriate, except that the protective order shall be valid for at least one hundred eighty days and not more than one year from the expiration date of the originally issued full order of protection." (Mo. Rev. Stat., § 455.040 (par. 1).)

[8] Missouri Revised Statutes, section 455.040 (par. 1).

[9] Missouri Revised Statutes, section 455.040 (par. 1).

[10] *Capps v. Capps* (Mo.Ct.App. 1986) 715 S.W.2d 547.

"Given the fundamental purpose of the Adult Abuse Act, the *prevention of further acts of abuse,* we conclude that the legislature intended that a renewal of a Full Order of Protection be granted to a petitioner who proves by a preponderance of the *evidence that the expiration of the Full Order will place petitioner in an immediate and present danger of abuse.* No new acts of abuse need to be alleged for a renewal. [¶] . . . [¶]

"Thus, we conclude that a renewal proceeding is not a civil action for purposes of a change of judge . . . ."[11]

The *Capps* court thus used the legislative purpose behind the overall abuse statute to fill in the missing term in the renewal provision of the protective order statute—the proof required to justify renewing an existing order. Because the purpose of the act is to prevent future acts of abuse, the court reasoned, evidence must demonstrate an "immediate and present danger" future abuse indeed will occur unless the court renews the initial protective order.

Two years later, in *Bandelier v. Bandelier,*[12] another Missouri appellate court reiterated the *Capps* criteria and reversed the renewal of a protective order. It did so based on the court's finding that the protected party produced insufficient evidence to satisfy the standard for renewal of such an order. "The sole testimony to which Mrs. Bandelier points as evidence of an immediate and present danger of abuse is her statement that Mr. Bandelier had been in her home 'several times' since the issuance of the original order. Although Mr. Bandelier's actions, two of which are admitted by him, violate the original order . . . , Mrs. Bandelier's bare statement does not meet the preponderance of the evidence test required to support a renewal order."[13]

Missouri courts continue to apply the *Capps* formula. But is its rationale—and especially its requirement of an "imminent and present danger" the restrained party will commit future acts of abuse—an appropriate standard for California?

---

[11] *Capps, supra,* 715 S.W.2d 547, 552 (italics added).

[12] *Bandelier v. Bandelier, supra,* 757 S.W. 2d 281.

[13] *Bandelier v. Bandelier, supra,* 757 S.W. 2d 281, 283.

B. *The Appropriate Standard Requires Evidence of a "Reasonable Apprehension of Future Abuse" Before Ordering Renewal of a Protective Order.*

The basic approach the *Capps* court used to derive Missouri's criteria for renewals of protective orders appears sound—and applicable to our interpretation of section 6345. The overall purpose of our "domestic violence" legislation is the same as Missouri's "adult abuse" laws—to prevent future acts of abuse. The renewal of existing protective orders is a part of that scheme and shares that overall legislative purpose. Consequently, in contested cases, a court is only justified in ordering an extension of such an order where it finds to do so will advance the legislative purpose of preventing future abuse. This means it must find evidence there is some reasonable risk, at least, such abuse will occur sometime in the future if the protective order is not renewed.

The California Legislature's specific provision to the effect the protected party need not produce "a showing of any further abuse since the issuance of the original order"[14] is identical to the similar provision in the Missouri statute. By its terms, this provision does not necessarily excuse the requesting party from making a showing of some kind—and certainly fails to relieve the trial court of the responsibility to determine in contested cases whether renewal indeed will further the statutory purpose of preventing future abuse. Instead, unless the restrained party expressly accedes to an extension or fails to challenge the protected party's request, this portion of section 6345 carries a negative pregnant: the court should consider whether other facts—past or present—justify a renewal of the protective order. That is, if section 6345 were intended to eliminate the need for any showing and any findings relevant to whether renewal would prevent future abuse, the Legislature would have said so.

The legislative history of section 6345 tends to reinforce the view a contested extension requires an inquiry into the probability future abuse will occur unless the court renews the protective order. As explained in the Senate Committee on the Judiciary legislative memorandum accompanying the original bill out of which the 1995 amendment emerged: "The length of the order should be based upon the *seriousness* of the facts and the *probability of repeat violence* to the victim and his or her family."[15]

---

[14] Section 6345.

[15] Senate Committee on the Judiciary memorandum. To the same effect is the comment from the Judicial Council. "The provision that increases the potential duration of restraining orders is appropriately limited to extreme cases. . . ." Both of these comments addressed a bill authorizing the court to issue protective orders with a term as long as 10 years, a bill ultimately replaced with a provision retaining the three-year maximum for the initial order, but permitting

What appears questionable—and certainly not inevitable—in the test the *Capps* court announced is the high standard it set—a requirement the trial court find an "*imminent and present* danger" the restrained party will commit future acts of abuse unless the protective order is renewed. This standard is not inherent in the legislative purpose of preventing future acts of abuse. It seems doubtful the California Legislature was only interested in preventing abuse that is "imminent and present" in the sense it would occur immediately or shortly after the existing protective order expired. A more likely purpose is the prevention of abuse where the court finds the protected party has a "reasonable apprehension" abuse will occur at some time in the future if the protective order is allowed to expire.

This "reasonable apprehension" language is the formula the California Legislature chose when it installed an objective test where a court bases its *initial* protective order on the prospective protected party's fear of future abuse.[16] It is not enough this party entertain a subjective fear the party to be restrained will commit abusive acts in the future. The "apprehension" those acts will occur must be "reasonable." That is, the court must find the probability of future abuse is sufficient that a reasonable woman (or man, if the protected party is a male) in the same circumstances would have a "reasonable apprehension" such abuse will occur unless the court issues a protective order. This same formulation appears appropriate when a trial court considers a contested request for an extension of the initial order.

At least one state has adopted a lower standard than Missouri, similar to this "reasonable apprehension" test, governing the decision whether to extend an initial protective order. In Ohio, the court can issue an order renewing a protective order if it finds a preponderance of the evidence supports a finding a petitioner or a petitioner's family or household members are simply *in danger* of being the victims of domestic violence. In *Woolum v. Woolum,*[17] the court held each application for renewal of a protective order must be considered on a "case-by-case" basis and that sometimes the past abuse giving rise to the initial order will be sufficient in itself to support a finding there is enough "danger" of future abuse should that order expire to justify an extension.[18] In the case before it, however, the court found the restrained

---

renewals including permanent ones. But if the Legislature considered the seriousness and probability of repeat abuse important factors when contemplating protective orders as lengthy as 10 years, certainly those factors are even more relevant when an order is being renewed *permanently.*

[16] "For purposes of this act, 'abuse' means any of the following: [¶] . . . [¶] (c) To place a person in *reasonable apprehension* of imminent serious bodily injury to that person or to another." (§ 6203, italics added.)

[17] *Woolum v. Woolum* (1999) 131 OhioApp.3d 818 [723 N.E.2d 1135].

[18] *Wollum v. Woolum, supra,* 723 N.E.2d 1135, 1136–1139.

party also had exhibited behavior during the time the initial order was in effect that buttressed the risk of future abuse.[19]

The requirement the party seeking the order entertain a "reasonable apprehension" of future abuse also is consistent with a case from Utah. The Utah law authorizes a court to grant a permanent protective order if the judge finds "there is a substantial likelihood of abuse or domestic violence."[20] In a case decided in 2001, *Bailey v. Bayles*,[21] a divorced and remarried woman sought a permanent protective order against her first husband. She alleged a pattern of physical and emotional abuse during their 27-year marriage and several incidents since then where the ex-husband stalked her and her new husband. In a two-to-one decision a Utah appellate court upheld the trial court's decision granting the protective order. The court interpreted the statutory test, a "substantial likelihood of abuse or domestic violence" as equating to "a present fear of future abuse." It then emphasized this "present fear" must be "reasonable and real."[22]

As the *Bailey* court explained, "[I]n both her petition and during her testimony, [the wife] clearly indicated to the trial court that she experienced a constant fear of [her ex-husband]. . . . Based on [the wife's] testimony, the trial court correctly concluded in its memorandum decision that [her] emotional distress was *reasonable*. [¶] . . . [W]e conclude that [the ex-husband's] conduct—repeatedly following [the wife], following [the wife's new husband], repeatedly calling [the wife's] home and workplace, coupled with the evidence of past abuse—was sufficient for the trial court to conclude that [the wife's] fear was *both reasonable and real*."[23]

Notably, our research has not discovered any state which allows a trial court to extend or renew a domestic violence protective order—without the express or implied consent of the restrained party—based solely on the protected party's mere desire for such an extension or her (or his) *subjective* fear or apprehension future abuse will occur should the existing order expire. Nor, for reasons explained earlier, do we conclude the California Legislature has done so in section 6345. Like California, several states authorize such extensions or renewals, usually of much shorter duration than California, without requiring evidence the restrained party violated the existing order by committing a new act of abuse. But this does not mean other evidence bearing on the need for a continued protective order is unnecessary or irrelevant.

---

[19] *Wollum v. Woolum, supra*, 723 N.E.2d 1135, 1137.

[20] Utah Code Annotated, section 30-6-2(1).

[21] *Bailey v. Bayles* (2001) 2001 UTApp 34 [18 P.3d 1129].

[22] *Bailey v. Bayles, supra*, 18 P.3d 1129, 1132–1133.

[23] *Bailey v. Bayles, supra*, 18 P.3d 1129, 1133, italics added.

■ We conclude that in California, as in the rest of the country, an objective test must be satisfied before a protective order is renewed in contested cases. From the language of California statutes and the legislative history, we have drawn the following formula (limited, however, to cases where the restrained party appears and challenges the requested renewal of the existing order). A trial court should renew the protective order, if, and only if, it finds by a preponderance of the evidence that the protected party entertains a "reasonable apprehension" of future abuse. So there should be no misunderstanding, this does not mean the court must find it is more likely than not future abuse will occur if the protective order is not renewed. It only means the evidence demonstrates it is more probable than not there is a sufficient risk of future abuse to find the protected party's apprehension is genuine and reasonable.

C.  *Factors the Trial Court May Consider in Determining*
*Whether the "Reasonable Apprehension" Test Is Satisfied.*

■ Evaluating whether the requesting party has a "reasonable apprehension" of future abuse when considering whether to renew an existing protective order poses a somewhat different problem than deciding whether to issue the original order. For one thing, there is that existing order and the factual predicate for its issuance—typically prior acts or at least threats of abuse, perhaps some psychological tests or similar evidence of the restrained party's predisposition to inflict abuse, and the like. The existence of the order itself often will be less telling than the facts supporting its issuance. Consequently, the trial judge ordinarily should consider the evidence and findings on which that initial order was based in appraising the risk of future abuse should the existing order expire.

■ On the other hand, the trial court should not permit the restrained party to challenge the truth of the evidence and findings underlying the initial order, as Konrad seeks to do in this case. This would contradict principles of collateral estoppel and undercut the policies supporting those principles. But this does not mean the trial court should be prohibited from looking behind the order itself when evaluating whether that order, often three years old, should be extended another three years or even, as here, permanently.

The restrictions contained in two orders may read precisely the same. Yet one may rest on a half-dozen violent acts against the protected party and a psychological evaluation the restrained party is a lifelong sociopath, while the other was based on a single threat issued in an angry moment during a painful divorce. Because of an amendment in 1998, protective orders can be issued because of persistent unwanted phone calls or letters—which fall into the same category as "molesting, attacking, striking, stalking, threatening,

sexually assaulting, battering, [or] harassing" the protected party.[24] That pattern of unwanted phone calls or letters may support the same set of prohibitions in the initial protective order as one predicated on a series of violent beatings. So the protective order itself often fails to disclose even the species of the conduct on which it is based—to say nothing of the degree or timing of that conduct or the risk it will be repeated in the absence of a renewed protective order.

■ All of which is to say the mere existence of a protective order, typically issued several years earlier, seldom if ever will provide *conclusive* evidence the requesting party entertains a "reasonable apprehension" of future abuse of any kind should that order expire. But the existence of the initial order certainly is relevant and the underlying findings and facts supporting that order often will be enough in themselves to provide the necessary proof to satisfy that test.

Also potentially relevant are any significant changes in the circumstances surrounding the events justifying the initial protective order. For instance, have the restrained and protected parties moved on with their lives so far that the opportunity and likelihood of future abuse has diminished to the degree they no longer support a renewal of the order? Or have there been no significant changes or even perhaps changes that enhance the opportunity and possibility of future abuse?

The other side of the equation—the "burdens" the protective order imposes on the restrained party—may or may not be a relevant factor in the trial court's consideration of a contested request for renewal of a protective order. Certainly those burdens would never justify denial of a renewed protective order where the "reasonable apprehension" is of future acts of *physical violence*. It is true those "burdens" on the restrained party can be very real. There often will be some social stigma attached while a person is subject to a protective order. Existing employers may frown on an employee who is subject to such an order and prospective employers almost surely will. Thus the restrained party may lose out on a promotion or a job. The continued existence of such an order likewise may, fairly or unfairly, interfere with the restrained party's social life. Furthermore, where children are involved, a protective order designed to prohibit access to an abused spouse may have the collateral effect of limiting the restrained party's access to his (or her) children even when they are not potential targets of abuse.

---

[24] Section 6320, as amended in 1996. This section defines all these acts as subject to injunction and section 6203, as amended in 1998, classifies them as "abuse" which if inflicted on a spouse, former spouse, cohabitant, former cohabitant, etc., constitutes "domestic violence" under section 6211.

██ Once again, however, the physical security of the protected party trumps all of these burdens the original or renewed protective order may impose on the restrained party. Thus, where the protected party has a "reasonable apprehension" of future *physical* abuse if the current protective order expires, that order should be renewed despite any burdens this inflicts on the restrained party. The Legislature has left little doubt about this balancing of risks and burdens in its domestic violence legislation.

The burdens the restrained party suffers from a renewed—and especially a permanent—protective order may become relevant, however, where the existing order focuses not on the threat of physical violence, but lesser forms of abuse —unwanted telephone calls or mail, for example. Where the worst "danger" the protected party must fear is a few unwanted calls or letters or e-mail messages, the court may have to weigh the seriousness as well as the degree of the risk against the significance of the burdens the restrained party will experience if subjected to a continuing protective order.

> D. *On This Appellate Record It Is Not Possible for This Court to Determine Whether the Trial Court Would Have Renewed This Order Had It Applied the "Reasonable Apprehension of Future Abuse" Test.*

In some cases it might be possible for an appellate court to conclude the trial court's error in failing to apply the "reasonable apprehension of future abuse" test represents "harmless error." The evidence and findings supporting the original protective order may have demonstrated the restrained party's prior violent behavior and predisposition to violence conclusively established that party posed a continuing risk warranting a permanent or at least lengthy extension of the initial order. Here, however, the findings supporting the trial court's original order, some three years before the hearing on the requested renewal, fall far short of a conclusive showing this order should be extended into the indefinite future. Nothing in the record properly before this court establishes Ritchie produced evidence of, or the trial court found, that Konrad had committed serious or even significant acts of violence against Ritchie or made significant threats to do same.

Perhaps recognizing the initial order was predicated on Konrad's largely nonviolent although admittedly objectionable conduct toward Ritchie, respondent's brief emphasizes the 1998 amendments expanded the grounds for issuing protective orders. Those additional grounds include "stalking, . . . harassing, telephoning, . . . destroying personal property, contacting, either directly or indirectly by mail or otherwise, coming within a specified distance

of, or disturbing the peace of the other party, . . ."[25] From the fragments of evidence in the record revealing what the trial court considered at the first hearing, it appears most if not all of the conduct the trial court used to justify the initial 1999 protective order fell into the nonviolent categories this 1998 amendment added. Furthermore, the evidence and findings we have before us from that 1999 hearing are insufficient to establish conclusively Ritchie could entertain a "reasonable apprehension" Konrad will even repeat these lesser, nonviolent forms of abuse should the protective order expire.

On the other hand, there was evidence tendered at the renewal hearing suggesting the circumstances had changed rather dramatically over the three years between the two hearings. It is conceivable those changed circumstances might reduce the probability of future acts of either violent or nonviolent conduct against Ritchie or her family members. At the time the court issued the initial protective order Ritchie and Konrad had rather recently terminated a four-year relationship and engagement. At that time, they were both living in the Los Angeles area. Three years later they were both married to other people, and Ritchie had moved to Henderson, Nevada, nearly 300 miles away from Konrad's home. Because the trial court considered Ritchie was entitled to a renewal of the initial order "upon request" it did not even consider this evidence of changed conditions.

Accordingly, for these reasons, we are compelled to reverse for a further hearing on Ritchie's requested renewal of the protective order. The purpose is to allow the trial court to apply the proper test and determine whether Ritchie's expressed fear of significant future abuse is reasonable and thus sufficient to warrant a permanent (or lengthy) extension of the original protective order. This court expresses no view as to the appropriate outcome of the trial court's reconsideration of the merits.

II. *THE TRIAL COURT LACKED THE STATUTORY AUTHORITY TO REMOVE THE "FIREARM RESTRICTION" AND, CONSEQUENTLY, ALSO MUST DECIDE WHETHER THAT FACTOR WILL AFFECT THE EXERCISE OF ITS DISCRETION IN GRANTING OR DENYING THE REQUESTED RENEWAL OF THE EXISTING PROTECTIVE ORDER.*

While the trial court here failed to evaluate whether Ritchie entertained a "reasonable apprehension of future abuse," it did balance what it perceived to be the protected party's right to renewal of the order against the burdens that

---

[25] See footnote 40, *post,* and accompanying text, for explanation of the 1998 amendments which created this expansion in the grounds for protective orders.

renewal imposed on the restrained party. In doing so, it applied the typical balancing approach used to decide whether to issue a regular injunction—the harm to the moving party if the injunction is not issued versus the harm to the other party if the injunction *is* issued.

The court focused on the firearm restriction as the sole significant burden Konrad would experience if it renewed the protective order. Nothing in the record suggests whether the trial court would have exercised its discretion to deny the requested renewal had it considered Konrad would remain subject to the firearm prohibition once the protective order was extended. That is because, as mentioned earlier, the trial court struck the "firearm restriction" from the order. It is entirely possible the court would have granted the requested renewal even if the judge realized the firearm restriction would remain in place despite its action deleting that provision from the face of the order. But on this record it is impossible to know.

It is apparent, however, the current statutory framework denied the trial court the authority to effectively delete the firearm restriction. Section 6389, subdivision (a) provides: "A person subject to a protective order, as defined in Section 6218, *shall not* own, possess, purchase, or receive a firearm while that protective order is in effect." Section 6218,[26] in turn, defines a protective order as one enjoining specific acts of abuse (such as contacting, molesting, or striking)[27] and/or excluding a person from a dwelling[28] and/or enjoining other behavior the court determines is necessary to effectuate (the other two types of order).[29]

Nothing in 6389, subdivision (a) or elsewhere[30] suggests the court is empowered to disable or modify the firearm prohibition section 6389,

---

[26] California Law Revision Commission comments, 29B West's Annotated Family Code (1994 ed.) following Section 6218, page 7.

[27] "The court may issue an ex parte order enjoining a party from molesting, attacking, striking, stalking, threatening, sexually assaulting, battering, harassing, telephoning, including, but not limited to, annoying telephone calls as described in Section 653m of the Penal Code, destroying personal property, contacting, either directly or indirectly, by mail or otherwise, coming within a specified distance of, or disturbing the peace of the other party, and, in the discretion of the court, on a showing of good cause, of other named family or household members." (§ 6320.)

[28] "(a) The court may issue an ex parte order excluding a party from the family dwelling, the dwelling of the other party, the common dwelling of both parties, or the dwelling of the person who has care, custody, and control of a child to be protected from domestic violence for the period of time and on the conditions the court determines, regardless of which party holds legal or equitable title or is the lessee of the dwelling." (§ 6321.)

[29] "The court may issue an ex parte order enjoining a party from specified behavior that the court determines is necessary to effectuate orders under Section 6320 or 6321." (§ 6322.)

[30] Both state and federal law impose criminal penalties on people subject to protective orders who own or possess firearms of any kind. (Pen. Code, § 12021, subd. (g)(1); 18 U.S.C., § 922(g)(8)(B).)

subdivision (a) *automatically* activates when a court imposes or renews any of the enumerated forms of protective orders. Ritchie argues differently in supplemental briefing this court requested on the firearm restriction issue. But her position is not persuasive.

In her supplemental brief, Ritchie points to a single sentence at the end of section 6389, subdivision (f) and urges this language allows a trial judge to modify or strike a firearm restriction. The sentence reads: "Nothing in this section [i.e., section 6389] shall limit a respondent's right under existing law to petition the court at a later date for modification of the order." The sentences which precede the sentence Ritchie quoted supply the necessary context and read as follows: "The *restraining order* requiring a person to relinquish a firearm pursuant to subdivision (c) *shall state on its face* that the respondent is prohibited from owning, possessing, purchasing, or receiving a firearm *while the protective order is in effect* and that the firearm *shall be relinquished* to the local law enforcement agency for that jurisdiction or sold to a licensed gun dealer, and that proof of surrender or sale *shall be filed* with the court within a specified period of receipt of the order. The order *shall also state* on its face the expiration date for relinquishment."

This series of sentences is followed by the sentence on which Ritchie relies. In context, however, that sentence refers to modifications of the underlying protective order, including for example terminating or shortening the term of that order. Because the existence and term of the firearm restriction is linked directly to the existence and term of the underlying protective order, a modification in the latter will automatically lengthen or shorten the term of the former. The quoted sentence merely makes it clear nothing in the firearm restriction law—including for example the required statement the relinquishment shall expire on a certain date—can impair a party's entitlement to "petition the court at a later date for modification of the [restraining] order [that required relinquishment]." But the latter sentence cannot be read to permit the court to strike the firearm restriction or modify it in any way at variance with the mandatory provisions of section 6389.

This court's view is reinforced as the context is expanded further to embrace the entire section 6389. That lengthy code provision is laced with provisions mandating surrender of firearms for the full term of any protective order. None of these sections hint the trial court possesses any discretion to avoid imposing these mandatory requirements or to provide any relief at any time during the duration of the underlying protective order. For example, section 6389, subdivision (b) orders the Judicial Council to include a "notice on all forms requesting a protective order that, . . . the respondent *shall be*

*ordered to relinquish* possession . . . of any firearms. . . ."[31] Section 6389, subdivision (c) then instructs the trial court what it must do if the restrained party is present in the courtroom. In that event, the court *"shall order . . .* [that party] to relinquish any firearm in that person's immediate possession. . . ."[32] Section 6389, subdivision (g) provides the "restraining order requiring a person to relinquish a firearm . . . *shall prohibit* the person from possessing or controlling any firearm for the duration of the order." This same subdivision then sets forth the procedures for returning any such firearm "within five days after the expiration of the relinquishment order, . . ." The firearm is *not* to be returned, however, if "another successive restraining order is used against the respondent. . . ."[33]

The only grant of discretion appears in section 6389, subdivision (h). It is limited to a special class of restrained parties, those who use a firearm as a necessary part of their employment. Even then the trial court's discretion is sharply circumscribed. The court must first find the "particular firearm is necessary as a condition of continued employment and that the current employer is unable to reassign the respondent to another position where a firearm is unnecessary." Having made that finding, the trial court must issue an order mandating "the firearm shall be in the physical possession of the respondent only during scheduled work hours and during travel to and from his or her place of employment."[34]

It is inconsistent with this extraordinarily narrow grant of discretion even when a restrained party uses a firearm as an essential part of his or her job to read into that single sentence at the end of section 6389, subdivision (f) an unfettered grant of power to trial courts allowing them to strike a firearm restriction entirely for any party it wants and for any reason it wants. It likewise is inconsistent with the Legislature's purpose in enacting the current version of section 6389—to entirely remove the trial court's discretion and mandate relinquishment of firearms whenever a protective order is issued. "California is one of only six states to enact this type of legislation. Most importantly, [it] eliminates the requirement that the petitioner prove a likelihood that a gun

---

[31] Section 6389, subdivision (b), italics added.

[32] Section 6389, subdivision (c), italics added.

[33] Section 6389, subdivision (g), italics added.

[34] Section 6389, subdivision (h). This subdivision has been amended to make special allowances for government "peace officers," but once again sharply circumscribes the trial court's discretion. "In any case involving a peace officer who as a condition of employment and whose personal safety depends on the ability to carry a firearm, a court may allow the peace officer to continue to carry a firearm, either on duty or off duty, if the court finds by a preponderance of the evidence that the officer does not pose a threat of harm. Prior to making this finding, the court shall require a mandatory psychological evaluation of the peace officer and may require the peace officer to enter into counseling or other remedial treatment program to deal with any propensity for domestic violence." (*Ibid.*)

will be used or threatened to be used in future acts of violence. . . . In other words, when someone is subject to a protective order . . . he automatically 'shall not own, possess, purchase, or receive a firearm while that protective order is in effect.' . . . By removing judges' case-by-case determinations, this change allows for a more uniform application of the law. . . . the court no longer has the discretion to decide the length of time for which the person must give up his weapons—the time period is equal to the duration of the order(s)."[35]

Some might quarrel with this inevitable and irrevocable pairing of protective orders and firearm restrictions. But it is not difficult to understand how it came to pass. If a person represents a substantial threat to inflict physical harm on another person, it appears reasonable to disarm the former, at least to take away the weapons most capable of causing death or death-threatening injury, e.g., firearms.[36] The logical connection has become less clear, however, with recent amendments allowing protective orders based primarily on nonviolent conduct, such as a pattern of unwanted and obnoxious communications (e-mails, telephone calls, letters, etc.).

As defined when the Legislature enacted the present version of section 6389 in 1995, a court could issue protective orders only where it was shown the restrained party had engaged in conduct calculated "intentionally or recklessly to cause or attempt to cause *bodily injury*; or *sexual assault*; or to place a person in reasonable apprehension of *imminent serious bodily injury* to that person or to another."[37] In 1998, however, as mentioned earlier in this opinion[38] the Legislature amended the statutory scheme to expand the definition of "domestic violence" and "abuse" to embrace nonviolent but harassing conduct. As a result, a trial court now can impose a protective order not only because of prior or threatened bodily injury, but also where the restrained party has only been "stalking, . . . harassing, telephoning, including,

---

[35] Note, *Getting the Guns: Implementation and Enforcement Problems with California Senate Bill 218* (2001) 75 So.Cal. L.Rev. 185, 191 (footnote omitted).

[36] "Although domestic violence can take many forms, abusers often use firearms to threaten, injure, or kill their victims. In fact, sixty-five percent of the approximately 52,000 intimate murders [e.g., murders between those who are intimates rather than strangers] involved firearms in 1996. In single victim/single offender incidents two years later, 'the number of females shot and killed by their husband or intimate acquaintance . . . was more than four times higher than the total number murdered by male strangers using all weapons combined." (*Note, Getting the Guns: Implementation and Enforcement Problems with California Senate Bill 218, supra*, 75 So.Cal. L.Rev. 185, 186–187.)

[37] Former, section 6203. (Italics added.)

[38] Section 6203. (Italics added.) See pages 397–399, *ante*.

but not limited to, annoying telephone calls as described in [Penal Code] Section 653m, [39] destroying personal property, contacting, either directly or indirectly by mail or otherwise, coming within a specified distance of, or disturbing the peace of the other party . . . ."[40]

---

[39] Penal Code section 653m reads: "Telephone calls or contact by electronic communication device with intent to annoy [¶] (a) Every person who, with intent to annoy, telephones or makes contact by means of an electronic communication device with another and addresses to or about the other person any obscene language or addresses to the other person any threat to inflict injury to the person or property of the person addressed or any member of his or her family, is guilty of a misdemeanor. Nothing in this subdivision shall apply to telephone calls or electronic contacts made in good faith. [¶] (b) Every person who makes repeated telephone calls or makes repeated contact by means of an electronic communication device with intent to annoy another person at his or her residence, is, whether or not conversation ensues from making the telephone call or electronic contact, guilty of a misdemeanor. Nothing in this subdivision shall apply to telephone calls or electronic contacts made in good faith. [¶] (c) Every person who makes repeated telephone calls or makes repeated contact by means of an electronic communication device with the intent to annoy another person at his or her place of work is guilty of a misdemeanor punishable by a fine of not more than one thousand dollars ($1,000), or by imprisonment in a county jail for not more than one year, or by both that fine and imprisonment. Nothing in this subdivision shall apply to telephone calls or electronic contacts made in good faith. This subdivision applies only if one or both of the following circumstances exist: [¶] (1) There is a temporary restraining order, an injunction, or any other court order, or any combination of these court orders, in effect prohibiting the behavior described in this section. [¶] (2) The person makes repeated telephone calls or makes repeated contact by means of an electronic communication device with the intent to annoy another person at his or her place of work, totaling more than 10 times in a 24-hour period, whether or not conversation ensues from making the telephone call or electronic contact, and the repeated telephone calls or electronic contacts are made to the workplace of an adult or fully emancipated minor who is a spouse, former spouse, cohabitant, former cohabitant, or person with whom the person has a child or has had a dating or engagement relationship or is having a dating or engagement relationship. [¶] (d) Any offense committed by use of a telephone may be deemed to have been committed where the telephone call or calls were made or received. Any offense committed by use of an electronic communication device or medium, including the Internet, may be deemed to have been committed when the electronic communication or communications were originally sent or first viewed by the recipient. [¶] (e) Subdivision (a), (b), or (c) is violated when the person acting with intent to annoy makes a telephone call requesting a return call and performs the acts prohibited under subdivision (a), (b), or (c) upon receiving the return call. [¶] (f) If probation is granted, or the execution or imposition of sentence is suspended, for any person convicted under this section, the court may order as a condition of probation that the person participate in counseling. [¶] (g) For purposes of this section, the term 'electronic communication device' includes, but is not limited to, telephones, cellular phones, computers, video recorders, fax machines, or pagers. 'Electronic communication' has the same meaning as the term defined in Subsection 12 of Section 2510 of Title 18 of the United States Code."

[40] This is the definition of the conduct a court can enjoin contained in section 6320. The 1998 amendments, in turn, broadened the definition of "abuse" in section 6203 to include, "to engage in any behavior that has been or could be enjoined pursuant to section 6320." This amendment had the effect of broadening the definition of "domestic violence" in section 6211 which it classifies to include any act of "abuse" [as defined in section 6203] inflicted on a spouse (and other categories of people in a domestic situation). Finally, section 6300 authorizes

■ As a consequence of these 1998 amendments, intended or otherwise, a firearms restriction becomes mandatory even when a trial court imposes a protective order based solely on the restrained party placing annoying telephone calls or sending unwanted e-mails, letters, or the like. It is true this sort of nonviolent behavior in some circumstance can "place [the other person] in *reasonable apprehension of imminent serious bodily injury.*" But a trial court no longer need make such a finding in order to issue a protective order. It is sufficient the evidence demonstrate one or the other of these nonviolent acts.

That a person who only makes annoying telephone calls or the like—with no indication he or she poses a reasonable threat of physical violence—should be subject to an automatic firearms restriction is not an obvious proposition. Yet under the present statutory framework, this is the inevitable result of a protective order issued on this basis. And it is for the Legislature, not this court, to revisit the wisdom of this consequence of the 1998 amendments it superimposed on the previous framework which linked the restrained party's potential for violent acts and that party's possession of firearms.

What is not clear in this case is whether the trial court would have renewed the protective order had it realized its attempt to strike the firearms restriction was a futile gesture. For this purpose, we assume the court had been correct in concluding it had no responsibility to determine whether Konrad posed a reasonable threat to repeat his offending conduct when the existing protective order expired. Nonetheless, at the same time, the court expressly recognized it desired to weigh the risk the protected party faced if the court denied the requested renewal against the burdens that renewal would impose on the restrained party. The trial court ordered the renewal only after believing it had entirely eliminated what it deemed the entire "burden" side of the equation.

This court can only speculate whether the trial court here would have renewed this protective order had it recognized the present statutory framework made it impossible for it to strike the firearm restriction. Konrad claimed he had legitimate reasons for wanting to at least possess and use, if not own firearms. In particular, he presented evidence his in-laws are avid hunters and outdoorsmen, and thus the firearm restriction interfered with his ability to participate fully with his new family and their activities. So there was significant evidence available supporting the conclusion the renewal of the order would impose a real, not just theoretical, burden on Konrad.

On the other side of the equation, Ritchie did not even attempt to present any evidence Konrad should be denied access to firearms because there was a

---

courts to issue various types of protective orders "for the purpose of preventing a recurrence of *domestic violence.*"

threat to shoot her. Indeed the trial court obviously concluded that was such a remote or non-existent threat it readily struck the firearm restriction, thus permitting Konrad to own, possess and use any firearm. And significantly, Ritchie did not object in the trial court when the judge eliminated the existing firearm restriction. Instead in her initial briefing and in a supplemental brief, Ritchie has vigorously supported the trial court's authority and decision to strike that provision. So it is more than apparent Ritchie does not consider Konrad a threat to use a gun to inflict serious bodily harm on her.

For these reasons, and as a second independent and sufficient grounds for reversing this judgment, we remand for the trial court to reconsider its renewal of the protective order with the understanding a renewal of that order will carry with it a continuation of the firearm restriction for so long as the renewed order remains in effect.

## DISPOSITION

The judgment is reversed and remanded with instructions the trial court reconsider petitioner's request the restraining order be renewed. In doing so, it should apply the "reasonable apprehension of future abuse" standard discussed in this opinion and also consider the effect of the court's inability to eliminate the firearm restriction while a protective order remains in place. This court expresses no views as to the appropriate outcome of the trial court's reconsideration of its original decision. Each side to bear its own costs on appeal.

Perluss, P. J., and Woods, J., concurred.

A petition for a rehearing was denied March 11, 2004, and appellant's petition for review by the Supreme Court was denied May 12, 2004.