Filed 10/29/24  Marriage of Godfrey CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re the Marriage of DON GODFREY and AMAL BOUTROS GODFREY. | D082526 |
| DON GODFREY,<br><br>        Respondent,<br><br>    v.<br><br>AMAL BOUTROS GODFREY,<br><br>        Appellant. | (Super. Ct. No. D563821) |

APPEAL from an order of the Superior Court of San Diego County, Leah Boucek, Commissioner.  Affirmed.

Amal Boutros Godfrey, in pro. per., for Appellant.

No appearance for Respondent.

A few years after Amal Boutros Godfrey (Amal) and Don R. Godfrey (Don) divorced, Don obtained a temporary restraining order (TRO) against Amal.  After an evidentiary hearing, the family court granted Don a two-year domestic violence restraining order (DVRO).  Amal contends on appeal that: (1) Don was not residing at the address he claimed to be living at when he

sought the TRO in December 2022; (2) Don's claims were "frivolous" and did not meet the legal standards for a DVRO; (3) the court should have considered video evidence that Amal did not commit "breaking and entering" as Don alleged; and (4) the court erred by not considering the undue burden a DVRO would place on Amal in the care of her adult son, A.G.

We conclude that Don's address at the time he sought the TRO is irrelevant to the validity of the DVRO. We further conclude that the family court had a sufficient basis for finding that Amal was harassing Don and disturbing his peace. To the extent Amal requested that the court compel Don to produce a video for admission into evidence, we conclude any purported error by the court in failing to compel discovery and admit the video would be harmless. Lastly, we conclude that the court properly considered the burden a DVRO would impose on Amal in caring for her son, and that the court did not abuse its discretion in granting a DVRO anyway. Accordingly, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Amal and Don were married for nearly 25 years when Don filed for divorce. After the divorce was finalized in 2019 and the court ordered their shared dwelling sold, Don moved into a rented home in Spring Valley, California, with their two adult sons. One of them, A.G., was 24 years old at the time of the DVRO hearing in April 2023. A.G. was born with a congenital heart disease, struggles with depression, and has been hospitalized in the past.

Don testified that he had been living in the rented Spring Valley house for a few years by the time of the evidentiary hearing, and though he lived

2

elsewhere temporarily, he moved back in October 2022. Don also subleased a room in the house to a married couple he knew from work.

Leading up to December 2022, Amal was a frequent visitor at the house. Because A.G. did not have a driver's license, Amal often took him to doctor's appointments and to run errands. According to Amal, when Don was at home, she generally stayed in her car and did not go inside. Don and his subtenants agreed that in the beginning, Amal would only park in the driveway and wait outside for A.G. to come out. At some point, however, Amal started going inside the house on a daily basis and often stayed all day. Amal said that Don was not living at the house when she was there because when she came to the house "several times," she saw that his room was empty. She said she only entered the house "because nobody else" besides the subtenants and her sons were living there.

During this time, Amal called or talked to A.G. "20, 30 times a day" to "make sure he takes his medication [and to] make sure he eats." She worried about A.G. often, and sometimes called A.G.'s brother up to "50, 100 time[s]" to ask him to check on A.G. According to Amal, when A.G. sometimes did not come out of the house on his own, she would knock on A.G.'s window and door "several times" and enter the house after waiting half an hour to take him to his appointments. Don said that sometimes Amal would "bang on the door for half an hour [and] scream and holler at [A.G.]" until he let her inside. Don also said that at one point, Amal took A.G.'s keys and let herself in. Whenever Don saw her at the house he asked her to leave or at least move out of the driveway, but she refused.

Don's subtenants also had conflict with Amal because Amal believed they were taking A.G.'s money, food, and personal items. One day she went into the house and confronted them about taking A.G.'s items. The

3

subtenants denied using his belongings, but Amal said they continued to do so. She also accused the subtenants of locking A.G. out of the house and keeping the house "freezing" cold. According to one of the subtenants, when Amal was around she would slam doors, make a lot of noise, act "very aggressive," and lock them out of the house. When the subtenants told Amal to leave and she refused, they called Don and the police to the house. And when Don asked her to leave, Amal told him she "would leave when [A.G.] is doing okay."

Don and his subtenants called the police multiple times to get Amal to leave, but Don said officers told them Amal had a right to visit A.G. In December 2022, a couple days before Don requested the TRO, Amal and A.G. were served with eviction notices at the house and told to vacate the premises. The following day, Amal went back to the house and called A.G. "a hundred times, waiting for hours and knocking on the door," then knocking on his window. According to Amal, A.G. eventually let her in, and when she walked into the home, one of the subtenants was taking a video of her and telling A.G. not to open the door. The subtenants asserted that the video showed Amal opening the door with her own keys, even though she never lived at the house and had no permission to enter. After Amal went inside, she gave A.G. medication and took him out for a drive. When she came back and tried to enter the house, she realized that Don had changed the locks while they were out.

The next day, Don applied for a TRO. He accused Amal of "breaking and entering," among other things. A.G. went back to live at the house after

4

he spent some time hospitalized, but Don's subtenants decided to move out around January or February 2023.

After an evidentiary hearing in April 2023 in which both parties appeared without counsel, the family court granted Don a two-year DVRO. The court found that Amal was frequently at and inside Don's residence uninvited, and even if A.G. allowed her inside, she remained in the residence all day without permission. The court further credited testimony that Amal locked the subtenants out of the house when she was inside, and that she also let herself into the home after somehow obtaining a key.

The court stated that it understood and appreciated Amal's "concern for her son's physical and mental health," and that Amal was "not capable right now of having [A.G.] live with [her]." It also observed it was "understandable that [Amal] want[s] to take him to the doctor or shopping or other outings." The court nonetheless found that taking care of A.G. did not require Amal to be inside the residence, and that in the past, it "was fine" for her to stay outside and allow A.G. to come out.

The court also noted that Amal herself testified she sometimes called her adult sons up to 100 times per day, knocked on the window and door of the house until she was let in, and was "inside the residence often enough and long enough" to know what was in the bedrooms and what food the subtenants were eating. The court found that Amal's refusal to leave when asked led Don and the subtenants to call the police numerous times for assistance. The court further noted that Don had to be called home from work to deal with Amal being inside the house. In granting the DVRO, the

5

court found credible Don's testimony that he "felt verbally abused and this behavior disturbed his peace[.]"

The written DVRO ordered Amal to have no contact with Don. It also required her to stay at least 100 yards away from Don and his home, workplace, and vehicle. The DVRO granted use, control, and possession of the Spring Valley property to Don.

## DISCUSSION

Amal contends that: (1) Don was not residing at the address he claimed to be living at when he sought the December 2022 TRO; (2) Don's claims in support of the April 2023 DVRO did not meet legal standards; (3) the family court should have considered video evidence that the subtenants and Don had in their possession; and (4) the court failed to consider the undue burden a DVRO would place on Amal in caring for A.G. As discussed below, we disagree with each of these contentions.

We review a grant of injunctive relief for abuse of discretion. (*Gonzalez v. Munoz* (2007) 156 Cal.App.4th 413, 420 [abuse-of-discretion standard applies to a grant or denial of a DVRO].) To the extent we are called upon to review the trial court's factual findings, we apply a substantial evidence standard of review. (*In re Marriage of G.* (2017) 11 Cal.App.5th 773, 780.) On appeal, we do not reweigh the evidence or second guess the credibility of witnesses. (*In re Marriage of Balcof* (2006) 141 Cal.App.4th 1509, 1531 (*Balcof*).) In determining whether substantial evidence supports the court's order, we view the evidence in the light most favorable to the order. (*In re Marriage of Drake* (1997) 53 Cal.App.4th 1139, 1151 (*Drake*).)

### I

Turning to Amal's first argument, it is unclear why Don's address at the time he sought the December 2022 TRO is relevant to the validity of the

DVRO. Amal claims Don did not reside at the Spring Valley house between October and December 2022. Amal has only appealed from the DVRO issued April 17, 2023, and the issue of whether the court erred in granting December 2022 TRO is not properly before us. Furthermore, the only time Don mentioned the Spring Valley address in his request for a TRO was to list it as a place he could receive court papers. Don sought a temporary stay-away order that included himself, his "home," his workplace, and his vehicle, but he did not give his home address or request exclusive use, possession, and control of any property. Don also did not contend at the DVRO hearing that Amal violated the TRO by coming to the house. Don's address in December 2022 thus had little relevance to the granting of either the TRO or the DVRO.

Although the DVRO does include the Spring Valley address in its "Control of Property" provision and grants exclusive use, control, and possession of the property to Don, Amal presents no argument as to why the court erred in giving Don *control* of the property in the DVRO. Amal does not appear to dispute that Don was living there at the time the DVRO issued in April 2023, nor does she claim she has any legal interest in the property. Amal herself confirmed that she never lived there.

To the extent Amal contends Don was dishonest by testifying during the DVRO hearing that he moved back into the house in October 2022, we do not second guess the credibility of witnesses. (*Balcof, supra*, 141 Cal.App.4th at p. 1531.) The family court explicitly found Don's testimony credible, and we have no reason to disturb its determination, especially considering that fact's limited relevance. (See *Longshore v. Desmond* (*In re Estate of Desmond*) (1963) 223 Cal.App.2d 211, 215 ["It is the exclusive function of the trial court to weight the evidence, resolve conflicts and determine the credibility of witnesses [citation] and if its interpretation . . . is reasonable, a

7

reviewing court will not disturb the trial court's determination in the matter unless an abuse of discretion is clearly shown [citation]."].) Accordingly, we find no grounds for reversal in Amal's argument that Don was not residing at the Spring Valley house in December 2022.

## II

Amal next argues that Don's assertions in support of the DVRO were "frivolous" and insufficient to justify granting a DVRO. When viewing the evidence in the light most favorable to the order, as we must, we disagree. (See *Drake, supra*, 53 Cal.App.4th at p. 1151.)

"Abuse" in the domestic violence context may, under Family Code[1] section 6203, subdivision (a)(4), include engaging "in any behavior that has been or could be enjoined pursuant to Section 6320." (§ 6203, subd. (a)(4).) Those behaviors include "harassing, . . . contacting, either directly or indirectly, . . . coming within a specified distance of, or disturbing the peace of the other party[.]" (§ 6320, subd. (a).) Abuse need not be violent or physical to warrant the issuance or renewal of a DVRO. (*See In re Marriage of Nadkarni* (2009) 173 Cal.App.4th 1483, 1495–1496 (*Nadkarni*); § 6320, subd. (a).) "[S]ection 6320 broadly provides that 'disturbing the peace of the other party' constitutes abuse . . . ." (*Nadkarni*, at p. 1497.)

"[T]he plain meaning of the phrase 'disturbing the peace of the other party' in section 6320 may be properly understood as conduct that destroys the mental or emotional calm of the other party." (*Nadkarni, supra*, 173 Cal.App.4th at p. 1497.) To obtain a DVRO, a protected party has the burden to show by a preponderance of the evidence that a reasonable person would

---

1    Further undesignated statutory references are to the Family Code.

have a " 'reasonable apprehension' " of future abuse. (*Ritchie v. Konrad* (2004) 115 Cal.App.4th 1275, 1290.)

Other than to argue her own version of events, Amal has failed to discuss the evidence supporting the trial court's order. Don testified that he sought a DVRO only after Amal began "coming to the house constantly, on a day-to-day basis." She sometimes stayed all day, and when Don or one of his subtenants asked her to leave, she refused. Officers were frequently called to the house to resolve conflicts. According to Amal's own testimony, she persistently knocked on the window and door of the house until she was let in. As the family court observed, she was "inside the residence often enough and long enough" to know what was kept in the bedrooms and what food the tenants were eating. Don was often called at work or had to leave work to go back to the house to deal with Amal's intrusions. Amal even caused conflict with Don's subtenants to the point that they moved out of the house. Moreover, Don testified that Amal verbally abused him and badgered him. This evidence provides a sufficient basis for the trial court's finding that Amal harassed Don and disturbed his peace, and that Don had a reasonable apprehension that Amal would continue disturbing his peace, which amounts to abuse for DVRO purposes. (See *Nadkarni, supra*, 173 Cal.App.4th at pp. 1495–1497; § 6320, subd. (a).) Accordingly, we affirm the court's finding of abuse.

## III

Amal argues the family court committed reversible error because it should have considered video evidence that would have shown she did not commit "breaking and entering," as Don alleged. Again, we disagree.

We use an abuse of discretion standard to review the trial court's rulings determining the relevance and admissibility of evidence. (*People v.*

9

*Green* (1980) 27 Cal.3d 1, 24–25; *People v. Garcia* (2001) 89 Cal.App.4th 1321, 1334.) The court abuses its discretion in deciding whether to admit evidence only when it acts in an "arbitrary, capricious, or patently absurd manner that result[s] in a manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10.) Only relevant evidence is admissible (Evid. Code, § 350), and "[t]he trial court has broad discretion . . . in determining the relevance of evidence" (*People v. Horning* (2004) 34 Cal.4th 871, 900).

As an initial matter, because the video was not marked as an exhibit and is not part of the record, we can only speculate about what it would have shown. Amal herself has never seen the video, so we cannot simply assume that it would show what she asserts it would show. Moreover, to the extent Amal is arguing she should have been given access to the video, as she had requested at various points during the evidentiary hearing, she cites no authority to support her argument. Until the recent enactment of section 6309, which went into effect after the hearing and lays out parameters for discovery in future domestic violence proceedings, it was unclear what discovery, if any, parties in such proceedings were entitled to. (See Stats. 2023, ch. 503, § 1, eff. Jan. 1, 2024.) Amal has not provided us with any legal argument as to why she had a right to discovery of the video before the enactment of section 6309.

But even assuming Amal made a proper request to receive and admit the video into evidence, and further assuming it was error for the court not to admit the video, any purported error would be harmless. Amal claims the video would have shown A.G. letting her into the house on the occasion that Don and his subtenant both accused her of using a set of keys to enter without permission. Amal further argues the video would have undermined Don's and his subtenant's credibility by revealing that they lied about what

10

the video shows.  But the court did not base its decision solely on that incident, nor did it make any finding that Amal actually committed "breaking and entering."  The court determined that Amal's harassing behavior consisted of her frequent and intrusive presence at and inside Don's residence over a period of time.  The court cited numerous examples outside of the purportedly recorded incident to support its decision to grant the DVRO, including examples drawn from Amal's own testimony.  We therefore conclude that to the extent there was any error on the court's part stemming from the video being absent from the record, Amal suffered no actual prejudice, and we decline to reverse on that ground.  (*See Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580 ["No form of civil trial error justifies reversal and retrial, with its attendant expense and possible loss of witnesses, where in light of the entire record, there was no actual prejudice to the appealing party."].)

IV

Lastly, Amal contends that the family court failed to consider the undue burden a DVRO would place on her in caring for A.G.  Not only does Amal fail to cite any authority regarding what role "undue burden" plays in whether to grant a DVRO, the record shows that the court did consider Amal's ability to care for A.G.  The court expressly stated that it understood and appreciated Amal's "concern for her son's physical and mental health," and that Amal was "not capable right now of having [A.G.] live with [her]."  It also observed that it was "understandable that [Amal] want[s] to take him to the doctor or shopping or other outings."  The court therefore clearly took into account the hardship a DVRO would impose on Amal and A.G.

To the extent Amal claims the court abused its discretion in deciding to grant the DVRO despite that hardship, we disagree.  According to Don, before

11

Amal started entering the house and staying there daily, A.G. was doing well, going to school, and working. Don's subtenant testified that he and his wife used to take A.G. to the gym and that A.G. seemed "normal," but that his mental health deteriorated when Amal started coming to the house more often. Amal even testified that there were times A.G. refused to come to the door or answer his phone when she called unless she called repeatedly or banged on the door. Moreover, the DVRO does not prevent Amal from visiting with A.G. at locations other than within 100 yards of Don and his home, workplace, and vehicle. In these circumstances, we cannot conclude that the court's act of discretion in granting Don a DVRO—despite the impact it would have on Amal's ability to visit A.G.—was "arbitrary, capricious or patently absurd." (*Dodge, Warren & Peters Ins. Services, Inc. v. Riley* (2003) 105 Cal.App.4th 1414, 1420.)

DISPOSITION

The April 17, 2023 DVRO is affirmed.


BUCHANAN, Acting P. J.

WE CONCUR:


KELETY, J.


RUBIN, J.

12