Filed 9/29/15  Kwelly-Lieras v. Lieras  CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| MARGARET KELLY-LIERAS,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>LARRY LIERAS,<br><br>        Defendant and Respondent. | A140756<br><br>(San Mateo County<br>Super. Ct. No. FAM0109234) |

In 2010, appellant Margaret Kelly-Lieras (Kelly-Lieras) obtained a three-year domestic violence prevention restraining order against her then-husband, respondent Larry Lieras (Lieras).  Shortly before the order was set to expire, Kelly-Lieras sought renewal of the order.  Following a hearing, the trial court denied her request, finding she had not established she had an objectively reasonable fear of future abuse by Lieras.  Kelly-Lieras appeals, contending the trial court's order constituted an abuse of discretion for a multitude of reasons.  We conclude her arguments lack merit, and we affirm.

## BACKGROUND

### The Initial Restraining Order

On May 27, 2010, Kelly-Lieras filed an ex parte request for a domestic violence prevention restraining order, seeking to bar Lieras, her husband of 16 years, from contacting or coming within 100 yards of her, the couple's two minor daughters, and Kelly-Lieras's mother and grandmother, as well as their homes, vehicles, schools, and workplaces.

1

In support of her request, Kelly-Lieras alleged that eight days earlier Lieras had assaulted her in an incident she described as follows:

"On May 19th at approximately 11 pm I was woken by [Lieras] punching me and yelling at me. He was screaming 'I'm sick of this' and continued to punch me. I stayed on my left side in the fetal position trying to protect myself. I got bruises on my left wrist, left hand, whole right arm including my shoulder, right jaw, and split my lip. The next day [Lieras] came home from work and told me I am lucky he held back. Next time he won't, I better change or else and that he will not hold back when it comes to that fat bitch Margaret and fat bitch Claudia. I will let them have it if you got me you got me [*sic*]. Claudia is my mother and Margaret is my grandmother. . . . Eight days after this incident my bruises are still visible and my right arm is still sore."

Kelly-Lieras also alleged that she and her daughters had long suffered abuse at the hands of Lieras, asserting that over the previous five years, he had verbally and physically abused them, as well as verbally abused her mother and grandmother. As Kelly-Lieras described it: "Throughout our relationship [Lieras] has been very verbal with hateful things towards myself and my daughters and when [Lieras] snaps he becomes violent (physically) toward me. With my children they are afraid to tell me what [Lieras] has done or said because he has told them 'not to say anything to anyone or they will have to deal with him.' When [Lieras] wants to talk with one of us he will always do it in the downstairs room where no one else in the house can hear and see. We are very vulnerable and try not to go but [Lieras] will get more upset so we go. [Lieras] has gotten mad at me because I came home late from Christmas shopping with my mother which resulted in [him] yelling at me, throughing [*sic*] things including a laundry basket and ended with him pinning me against the downstairs back door and choking me to the point I started losing consciousness." As additional specific examples, she described an incident in January 2009 when Lieras punched one daughter in the mouth because she had "messed up at softball practice" and another incident in July 2009 when he hit and choked Kelly-Lieras because he was mad about something she had purportedly done wrong.

Kelly-Lieras's declaration concluded with this: "Myself and my daughters live day to day in fear of what [Lieras] will do to us or my grandmother who is frail and elderly or my mother. By being awarded this restraining order and removing [Lieras] from the house would allow us to move on, heal, and not be afraid day in and day out."

On May 27, 2010, the trial court issued a temporary restraining order barring Lieras from harassing, attacking, striking, threatening, assaulting, hitting, following, stalking, molesting, destroying the personal property of, disturbing the peace of, keeping under surveillance, blocking the movements of, or coming within 100 yards of Kelly-Lieras, the couple's two daughters, and Kelly-Lieras's grandmother, as well as their home, vehicles, schools, and workplace.

On June 18, 2010, the court issued a three-year restraining order.[1] Lieras was also ordered to immediately move out of Kelly-Lieras's grandmother's home where the family was living.

**Kelly-Lieras's Request to Renew the Restraining Order**

On May 22, 2013, Kelly-Lieras filed a request for a five-year renewal of the restraining order, which was set to expire the following month. In support, Kelly-Lieras's written declaration stated she was "afraid of abuse in the future" for the following reasons:

"During court hearings in the hall with both attorneys present [Lieras] has yelled down the hall to me 'You better listen and you better listen well!' He has stood behind his attorney giving mean stare downs in a threatening manner. During supervised visitations he has kicked [our daughter] under the table, whispered to them so the supervising person and court order supervising therapist couldn't hear what he is talking about with the children. Conversations at these visits are not positive. The children come out crying because he is harping on them about their sports and school. He tells the girls not to tell me or their grandmother who was supervising the visits what he said to them. I had to go back to court and change supervised visits to court supervised visits

_____

[1] It was narrower in scope than the temporary restraining order, however, applying only to Kelly-Lieras and not her grandmother or the couple's children.

3

because he was getting out of hand with my mother in his mannerism (angry), disrespectful, and very rude.  The children do not like to go for visits with him and have told him and the therapist at the visitation center and Rally [Family Visitation Services] that they do not feel safe around him. . . . To this day if we see him in passing we are scared to death of what he will do or say and try to quickly get out of the area.  My oldest daughter . . . gets severe medical/physical issues when she knows she is going to see him.  It impacts her daily life and she misses school because of it.  We are still extremely afraid of [Lieras] and what he can and will do if there is no longer an active [restraining order].”[2]

Lieras filed opposition to the renewal request, asking the court to set the matter for trial because he believed Kelly-Lieras did “not have a reasonable basis for her request.”

In reply, Kelly-Lieras represented that Lieras had been convicted of domestic violence against her, resulting in a 15-day jail sentence and an 18-month probation.  She reiterated that he had expressed aggression against her in a courthouse with both attorneys present, yelling at her and staring her down in a threatening manner.  In light of his “violent criminal conduct and potential future violent acts,” she continued to feel unsafe.

**Hearing On Kelly-Lieras’s Renewal Request**

Kelly-Lieras’s request to renew the restraining order came on for hearing on July 19, 2013.  The first witness to take the stand, Kelly-Lieras testified that she remained “scared” and “afraid for [her] life” as a result of the 2010 incident.  This was so because the day after the incident, Lieras told her, “You are lucky I held back because the next time I will not.”  He had never shown remorse or apologized for the incident.

---

[2] The above-quoted statement is taken verbatim from an attachment to a Judicial Council form completed by Kelly-Lieras.  As it appears in the record, it seems to be incomplete, since it actually commences with the partial phrase, “try to move away from him.”

4

After Kelly-Lieras obtained the initial restraining order, she felt "a little safer," but she still "watch[ed] over [her] shoulder all the time" because she did not believe Lieras had changed and she still feared "something could happen."

In the three years since the issuance of the restraining order, Kelly-Lieras had mostly seen Lieras in court, at which time he had made threatening comments to her. Specifically, on one occasion, when he was standing with their respective attorneys, he yelled in a loud and angry voice, "You better listen and you better listen well." Kelly-Lieras heard him even though she was two courtrooms away. More recently, when they were standing outside a courtroom with their attorneys, Lieras stood behind his attorney and gave her a "very mean scary looking stare down." It made her afraid: "I am scared for my life and I am afraid the next time I may not survive it."

According to Kelly-Lieras, just seeing Lieras in court for the hearing made her afraid because it brought back what had happened three years ago and made her fearful of what could happen in the future. She did not think he had changed in the intervening three years, believing he was even more angry because she obtained the restraining order and pressed charges: "I think the anger has gotten worse because I did it. I didn't just sit there and take it." She felt he could kill her if the restraining order was not renewed.

On cross-examination, counsel for Lieras asked Kelly-Lieras about the incident in which Lieras yelled down the hallway in the presence of their attorneys. When asked what she heard Lieras say to her, Kelly-Lieras responded, "He yelled, 'You better listen and you better listen well.' He was 'She better listen and she better listen well' were the exact words he yelled down the hall." When asked if he made the remark to her or her attorney, she answered that he was turned in her direction.

Counsel for Lieras asked her how many times, other than court appearances, she had seen Lieras in the past three years. Kelly-Lieras answered a "couple in passing such as the freeway and that, but not an intentional meeting." Asked to describe specific incidents, she identified one time when they were both driving on the freeway and he "kept moving toward where [she] was, like trying to wave 'Hi' and [she was] trying to get away." She was afraid and got his probation officer on her speakerphone and told

him to tell Lieras to get away from her. She did not make a police report, instead contacting his probation officer as she had been instructed to do. Another time they passed each other in a McDonald's parking lot but there was no interaction. When she stated, "To this day if we see him in passing, we are scared to death of what he will do or say and try to quickly get out of the area" in her declaration, she was referring only to those two incidents.

Kelly-Lieras also discovered at one point that Lieras was living across the street from where their daughters went to school. She was afraid because she would have to drive by every day when she dropped off and picked up their daughters. She immediately contacted his probation officer to request that Lieras move.

Kelly-Lieras had not seen Lieras at her place of employment, but about a year earlier, two of her coworkers told her they had seen him there. She was scared, so she contacted her building security and provided a copy of the restraining order and a photo of Lieras.

At the time of the hearing, Kelly-Lieras did not know where Lieras was living nor did she know his telephone number. She believed, however, that he knew her telephone number, although he had not contacted her on it.

Clinical psychologist Richard Ferry testified as a domestic violence expert on Kelly-Lieras's behalf. He did not evaluate her, having spoken with her for less than five minutes, and instead gave "generic jury education testimony about the common experiences of battered women." Ferry testified that it is common and reasonable for a victim who received multiple injuries from her abuser to fear the abuser three years later because abuse often involves creating an expectation of future abuse. And, according to Ferry, "Those expectations don't have an expiration date or a shelf date, a shelf life like a quart of milk. There is significant individual variation across victims, but it is well within normal limits that a woman or a man who's been battered in an intimate relationship will remain fearful for quite some time afterwards." Ferry likened it to being bitten by a dog and subsequently being afraid of dogs, which is a reasonable fear for that person.

6

Lieras was the final witness to testify.  At the time of the hearing, he was working at a law firm in Menlo Park and living in Millbrae, approximately 10 miles from Kelly-Lieras's grandmother's house.  He never had occasion to go to his old neighborhood.

According to Lieras, Kelly-Lieras worked at Kaiser Permanente.  She had previously worked at the Redwood City location, but he had heard she had transferred to a different location, although he was not know where that was.  He acknowledged that he had been at her workplace the previous year, explaining that he was a Kaiser Permanente member and was only there to have an eye examination and get new glasses.  He had spoken to two of her coworkers but did not ask any questions about Kelly-Lieras.  He saw them again more recently when he returned to get new contact lenses, but he did not see Kelly-Lieras.

Lieras gave a different version of the freeway incident Kelly-Lieras described.  According to him, he was "driving along" and "just happened" to look and saw Kelly-Lieras speeding up behind him.  She "just passed [him] up" and "sped off" and he "just went on [his] way."  He denied waving to her, speeding to catch up with her, or chasing her.  Shortly after he got off the freeway, he pulled over and reported the incident to his probation officer.

As to the second encounter Kelly-Lieras mentioned, Lieras testified he was on his way to McDonald's before going to church when they suddenly drove past each and "we both kind of stopped and looked at each other and I just looked at her and she just looked at me and then a few seconds later she just took off and that was it."  He did not interact with her at all.

Lieras also described two additional encounters over the previous three years.  On one occasion, he was driving home from church when he saw Kelly-Lieras driving away from a store with their two children.  The children saw him, but he ignored them because he did not want to wave and have Kelly-Lieras think he was waving at her.  On another, he had just come out of a credit union where both he and Kelly-Lieras did their banking and was about to go back in, but he saw her going in so he left.  According to Lieras, he had made no attempts to contact Kelly-Lieras since the restraining order was issued, had

not received any information suggesting he had violated the restraining order, and had no intention of contacting her in the future.

Lieras acknowledged that shortly after he was released from jail, he moved in with a friend who lived across the street from his daughters' school. He received a call from his probation officer, who gave Lieras one day to move after Lieras told him he was living directly across from the school rather than one block behind it, as the officer had believed. Lieras moved out as instructed.

When asked about the incident in the courthouse that Kelly-Lieras described in her testimony, Lieras denied having yelled at her. He acknowledged, however, telling her attorney, "She better listen." He claimed that the comment arose in connection with their property division, explaining that he expected to get back an old money collection, and he wanted to make sure she returned it to him since she had packed up his belongings and sent them to storage.

Lieras acknowledged he had been convicted of spousal abuse and served a jail sentence, following which he was placed on 18 months probation. As a condition of his probation, he was required to complete a 52-week domestic violence program. He completed the program, which included both individual and group therapy sessions, and he never violated probation. He also participated in individual therapy on his own for a year and a half, and his visits with his children were supervised by a therapist. As of the hearing, Lieras was still not seeing his children unsupervised, because Kelly-Lieras had wrongly told the therapist that there was a restraining order prohibiting him from seeing the children.

Following testimony and closing argument, the court rejected Kelly-Lieras's position that it was required to automatically renew the restraining order where, as here, the restrained party had been convicted of domestic violence, and an expert testified that the victim's fear of future abuse was reasonable. Instead, the court noted that the evidence supporting the issuance of the initial restraining order was one factor to consider, but that other factors were relevant as well, such as "other things that have

occurred or . . . the status of both parties [to] determine if there is a reasonable apprehension of future abuse."

The court then went on to rule, first noting that while there was no doubt Kelly-Lieras was the victim of domestic violence in 2010, there was no evidence she was undergoing therapy to address her fears. It then expressed "concern about her testimony":

"Her belief is, as she said several times, not that she might get hurt again but that she could, he could cause her harm up to 'I could be dead' is what she stated, that is a quote. So her fear is not just that he might hurt her, is that her fear is that he is going to kill her. I didn't see any evidence to back that fear up, that in itself I don't believe that's reasonable for her to believe, based even on these circumstances of what happened in the past that he at this point in time in their lives is going to kill her.

"And—but if I was to accept that that she is so fearful that he is going to kill her, she then testified that he came to her workplace. She hears about it, she doesn't call the police, she doesn't call her attorney, she doesn't come to court to say there was a violation of the restraining order, files a contempt. She doesn't do anything except go to the security guard when there were other things that could have protected her more and better.

"So there is a conflict there. Does she really believe that he is going to kill her and if he showed up at work, then why didn't she act appropriately to that belief or, perhaps, her belief is not that strong that he is going to actually hurt her or kill her.

"And then there is the inconsistency in the declaration in today's testimony that the interaction that they had in the courthouse was a threat against her and it was directed at her and as we now know that's not the case. It was not directed to her. He said 'she better listen' as opposed to 'you better listen.'

"Lastly, again, I believe that if she was, if she had these fears and was so distraught over these years about what had happened to the point where even seeing him passing on the freeway or passing at the, in a driveway at McDonald's that I would have heard that she is seeking some sort of counseling.

9

"Again, I didn't hear she is not going to counseling, but I am going to assume that if she was in therapy and trying to get this, these issues dealt with, I would have heard about it because it would have been relevant to the, to her state of mind and somebody who is in so much fear or in living this way I would, I would hope would be in counseling.

"And the last piece I don't believe is of reasonable belief or some feeling that's within reason is that she said he had a child support case recently and that he was staring her down. The fact that they were, that no words were exchanged, they were in a courthouse, they were with attorneys. I just don't think that's reasonable.

"It does appear that the separation between the parties, what Mr. Lieras has stated that he has done in the meantime besides the required 52-week batterer classes, that he continued with some individual therapy on his own has helped to resolve the underlying issues as contemplated by [Family Code section] 6220. And at this time I am not going to renew the restraining order."

Kelly-Lieras filed a timely notice of appeal.

## DISCUSSION

The Domestic Violence Prevention Act (Fam. Code, § 6200 et seq.)[3] exists "to prevent acts of domestic violence, abuse, and sexual abuse and to provide for a separation of the persons involved in the domestic violence for a period sufficient to enable these persons to seek a resolution of the causes of the violence." (§ 6220.) As provided in section 6345, subdivision (a), a domestic violence prevention restraining order "may be renewed upon the request of a party, either for five years or permanently, without a showing of any further abuse since the issuance of the original order, subject to termination or modification by further order of the court either on written stipulation filed with the court or on the motion of a party. The request for renewal may be brought at any time within the three months before the expiration of the orders."

---

[3] All statutory references are to the Family Code.

10

Section 6345 does not provide a standard for a trial court to apply in deciding whether to grant a renewal request. In *Ritchie v. Konrad* (2004) 115 Cal.App.4th 1275, 1290 (*Ritchie*), the court engaged in an in depth analysis of what that standard should be, ultimately holding that "[a] trial court should renew the protective order, if, and only if, it finds by a preponderance of the evidence that the protected party entertains a 'reasonable apprehension' of future abuse." In *Lister v. Bowen* (2013) 215 Cal.App.4th 319, we recently discussed the *Ritchie* holding, summarizing it as follows:

"When contested, a request to renew a restraining order should not be granted pursuant to section 6345 simply because the requesting party has 'a subjective fear the party to be restrained will commit abusive acts in the future.' [Citation.] 'The "apprehension" those acts will occur must be "reasonable." That is, the court must find the probability of future abuse is sufficient that a reasonable woman (or man, if the protected party is a male) in the same circumstances would have a "reasonable apprehension" such abuse will occur unless the court issues a protective order.' [Citation.] However, an imminent and present danger of abuse is not required. [Citation.] In other words, under this objective test, '[a] trial court should renew the protective order, if, and only if, it finds by a preponderance of the evidence that the protected party entertains a "reasonable apprehension" of future abuse. . . . [T]his does not mean the court must find it is more likely than not future abuse will occur if the protective order is not renewed. It only means the evidence demonstrates it is more probable than not there is a sufficient risk of future abuse to find the protected party's apprehension is genuine and reasonable.' [Citation.]

"In evaluating whether the requesting party has a reasonable apprehension of future abuse, 'the existence of the initial order certainly is relevant and the underlying findings and facts supporting that order often will be enough in themselves to provide the necessary proof to satisfy that test.' [Citation.] 'Also potentially relevant are any significant changes in the circumstances surrounding the events justifying the initial protective order. For instance, have the restrained and protected parties moved on with their lives so far that the opportunity and likelihood of future abuse has diminished to the

11

degree they no longer support a renewal of the order?' [Citation.] Also relevant are the seriousness and degree of risk, such as whether it involves potential physical abuse, and the burdens the protective order imposes on the restrained person, such as interference with job opportunities. [Citation.]" (*Lister v. Bowen, supra,* 215 Cal.App.4th at pp. 332-333; accord, *Eneaji v. Ubboe* (2014) 229 Cal.App.4th 1457, 1463.)

We review an appeal from an order denying a request to renew a domestic violence restraining order for abuse of discretion. (*Lister v. Bowen, supra,* 215 Cal.App.4th at p. 333; *Eneaji v. Ubboe, supra,* 229 Cal.App.4th at p. 1463.) As we explained in *Lister v. Bowen, supra,* at page 333, an abuse of discretion occurs where " ' "the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' " We conclude the trial court's denial of Kelly-Lieras's renewal request did not exceed the bounds of reason, and there was no abuse of discretion.

In the three years since the issuance of the initial restraining order, Lieras had not made any efforts to contact Kelly-Lieras, and there was never a finding that Lieras violated the restraining order. Kelly-Lieras testified to two brief encounters—one on the freeway and one in a McDonald's parking lot—but she confirmed both were unintentional. Lieras also acknowledged two additional encounters of which Kelly-Lieras appeared to be unaware—one outside a store and another outside a credit union. In both of those instances, Lieras acted appropriately, taking steps to avoid coming into contact with Kelly-Lieras. He also complied with his probation officer's instruction to move within one day when Kelly-Lieras reported that he was living across the street from the school their daughters attended.

There was testimony that Lieras was seen at Kelly-Lieras's place of business, Kaiser Permanente, but there was no evidence Lieras had gone there to contact, stalk, or menace Kelly-Lieras in any way. Rather, he testified that he was a Kaiser patient and had merely gone there for an eye examination and a new pair of eyeglasses. He

12

acknowledged having encountered two of Kelly-Lieras's coworkers while there, but he made no inquiries concerning Kelly-Lieras.

Additionally, there was evidence that the parties had "moved on with their lives so far that the opportunity and likelihood of future abuse has diminished . . . ." (*Ritchie, supra,* 115 Cal.App.4th at p. 1291.) The couple had divorced since the initial restraining order was issued. Lieras was living approximately 10 miles away from Kelly-Lieras's grandmother's home and had no occasion to return to his old neighborhood. He did not know where Kelly-Lieras worked, as he believed she had transferred from her previous location. Kelly-Lieras did not know where Lieras lived and did not have his contact information.

Further, Lieras had taken steps to address his abusive tendencies. He completed a 52-week domestic violence treatment program, participating in both individual and group therapy as a part of that program. He also participated in individual therapy outside of that program. Lieras had satisfied the terms of his probation without incurring any violations. This suggests that the likelihood of future abuse had diminished (*Ritchie, supra,* 115 Cal.App.4th at p. 1291), as had the need "to provide for a separation of the persons involved in the domestic violence for a period sufficient to enable these persons to seek a resolution of the causes of the violence." (§ 6220.)

While it is true that the underlying facts supporting the initial restraining order "often will be enough in themselves to provide the necessary proof" to renew the order (*Ritchie, supra,* 115 Cal.App.4th at p. 1291), the trial court must also consider significant changes in the circumstances that supported the initial order. (*Ibid.*) In light of the above detailed changes, we cannot say that it was outside the bounds of reason for the trial court to conclude that Kelly-Lieras had not demonstrated by a preponderance of the evidence that she had an objectively reasonable fear that Lieras would harm her in the future.

In challenging this conclusion, Kelly-Lieras asserts four errors by the trial court. First, she contends that the trial court erred in limiting its analysis to developments since the initial restraining order was issued. That was not in fact the case. The trial court denied the repeated attempts by Kelly-Lieras's counsel to introduce evidence of the abuse

13

that formed the basis for the initial restraining order. But as the trial court explained, this was because it had heard Kelly-Lieras's initial restraining order request, had reviewed the court's file from that initial restraining order request, and did not need to hear that evidence again. It cannot be said on this record that the trial court did not consider the evidence.

In a somewhat related argument, Kelly-Lieras next contends the trial court applied the wrong legal standard when it failed to consider the reasonableness of her ongoing fear in light of the past physical abuse she suffered. Kelly-Lieras's position is that "where the underlying abuse was violent and physical as it was here," and when the protected party is "willing to get up in court and testify that they still fear their abuser at a contested hearing, and they express reasons for that ongoing fear and bring an expert to provide testimony supporting the objective reasonableness of the testimony, that evidence should be sufficient to justify renewal." By this argument, Kelly-Lieras apparently suggests that renewal should be automatic when the initial restraining order was necessitated by physical abuse, the victim testifies she is in fear of future abuse, and an expert testifies that fear is reasonable. That is not the law. As *Ritchie* held, and as we discussed above, the court must decide whether the victim's fear of future abuse is objectively reasonable, taking into consideration the past abuse *and* changes in the parties' circumstances.[4]

Third, Kelly-Lieras contends the trial court failed to consider the lack of any significantly changed circumstances since the issuance of the initial restraining order. This argument is undermined by the record, which contains evidence of changed circumstances.

Finally, Kelly-Lieras argues the trial court erred in basing its denial of her renewal request on the lack of evidence that she had participated in therapy to address her ongoing fear of abuse. We agree that this was not an appropriate factor for the trial court to consider. The court's reasoning would, as amicus curiae Family Violence Appellate

---

[4] It is also significant that expert witness Ferry testified *generally* to the reasonableness of a victim's fear of future abuse based on past abuse, but he offered no opinion about the reasonableness of *Kelly-Lieras's* fear under the circumstances.

14

Project rightly notes, "effectively impose a burden upon victims of domestic violence to proffer evidence of their participation in rehabilitation services before their apprehension of future abuse could be found to be genuine or reasonable." Such evidence is not required by section 6345, subdivision (a) or case law. There are many reasons a domestic violence victim may not pursue therapy that are unrelated to the victim's apprehension of fear, be it a lack of access to treatment services, a preference for using other coping strategies, or a perception that therapy is stigmatizing, to name but a few. This conclusion does not, however, compel reversal, because the absence of evidence that Kelly-Lieras participated in therapy was not the sole factor behind the court's decision. The record contains additional evidence supporting the trial court's decision—discussed above—such that there was no abuse of discretion.

### DISPOSITION

The order denying Kelly-Lieras's request for renewal of the original domestic violence prevention restraining order is affirmed.


_____
Miller, J.


We concur:


_____
Kline, P.J.


_____
Stewart, J.