Filed 3/8/22  Detwiler v. Detwiler CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| STEPHANIE DETWILER, | C093015 |
| Plaintiff and Respondent, | (Super. Ct. No. FL2017690) |
| v. | |
| SEAN DETWILER, | |
| Defendant and Respondent. | |

Appellant obtained a domestic violence restraining order against respondent, her husband at the time, with whom she shares a minor child.  Appellant later filed a request to renew the order.  (Fam. Code, § 6345.)[1]  After a contested hearing at which both appellant and respondent testified, the trial court denied appellant's request to renew the

---

[1]     Undesignated statutory references are to the Family Code.

1

order.  On appeal, appellant contends the trial court abused its discretion by applying the wrong standards when considering her request.  We affirm.

BACKGROUND

A.    *Original domestic violence restraining order*

In May 2017, appellant requested a domestic violence restraining order against respondent for herself and the couple's minor child (daughter).  In the pleading, appellant described numerous incidents of abuse by respondent.

In the earliest incident, "[respondent] was angry that the house was a mess," and "didn't speak" to appellant "or the kids" for several days.  On the fourth day, when respondent "came into the house he threw his bike bag at" appellant and daughter, "and stomped up the stairs" to the couple's room.  Appellant was "scared" by respondent "acting violent," so she decided to go to a friend's house.  Respondent "asked where [she] was going in a very angry tone," and "made a snide comment about not being invited."

In the next incident, respondent "got very angry" when arguing with appellant about her children (his stepchildren), and "blocked [her] way out of [a] closet" as she was getting dressed in the morning.  Later that day, respondent "stomped into the house and started knocking things over in the living room and kitchen."  That night, he yelled at her that she "was a bad mother" and "didn't give him enough sex."  She stayed at a friend's house that night because she "did not feel safe going home."

The third described incident occurred during a family trip to Lake Tahoe in June 2016.  When the family was at a pool, "[respondent] got angry about something and stormed off."  Later in the hotel room, he told appellant to "go away" and keep the children ("those brats") quiet.  When appellant and the children returned from dinner, "[he] stormed out of the bedroom and demanded that [she] give him the keys to the car."  She refused.  He "moved really close to [her] and called [her] a bitch and demanded" the keys.  She again refused.  He "grabbed [her] arm and swung [her] around and told [her]

2

[she] wasn't leaving the room until he had the keys." He grabbed her "other wrist and shook" her. He "threw [her] against the door." "The hotel called the police," who took photographs of a bruise on appellant's back. "The next morning, [appellant] found a very large bruise on [her] . . . arm from where [respondent] grabbed" her. Police took photographs of the bruise.

In July 2016, respondent "followed" appellant and "stepped very close to [her] and started yelling at [her]." She backed away "to put space between" them, but he "again moved into [her] personal space."

In August 2016, as they discussed their finances, respondent gave appellant "a dirty look" and "stomped out of the house and left for several hours."

In January 2017, appellant was with "a date" at her home when respondent unexpectedly appeared. He "got angry and asked if [she] had a man in the house." He called her "a slut and a whore in front" of daughter. Respondent "pushed past" appellant and entered the house. As he moved up the stairs, she warned him she would call the police. He "turned around" and "shoved" her "as he went by [her]" and left the house.

The last described incident occurred in April 2017. At the time, respondent and appellant worked in the same office building in downtown Sacramento. Appellant and her coworker were walking to work when respondent "veered into" them as all three crossed the street. "[Respondent] then loomed over and glared at" them.

After a contested hearing on August 18, 2017, the trial court granted appellant's requested restraining order for a three-year period, ordering respondent to stay at least 100 yards away from appellant and daughter, and not contact them by phone or e-mail, among other things. Further, the trial court (a) granted to appellant sole physical and legal custody of daughter, (b) ordered respondent "to attend and complete a 52 week Batterer Treatment Program," and (c) permitted respondent to have "professionally supervised visit[s]" with daughter.

3

In July 2018, to address the complicated situation of the parties' shared work location, the order was amended to permit respondent to be on multiple floors of the Sacramento office building "during work hours to perform his work duties."

B.     *Request for renewal and October 2020 hearing*

In May 2020, appellant requested a renewal of the restraining order, alleging respondent "violated the restraining order at least [eight] times." Appellant explained that she was afraid he would abuse her in the future because he "abused [her] during [their] marriage, as well as" daughter, who "still suffer[ed] from [posttraumatic stress disorder] from the assaults." "I continue[ ] to be treated for [posttraumatic stress disorder] due to the abuse," she continued.

In his pleading opposing the renewal, respondent argued he had "not violated the restraining order at least [eight] times." Further, he argued the restraining order made it difficult for him to (a) see daughter and (b) "work in the same building as [appellant] or seek any other employment that require[d] . . . a background check."

At the beginning of an October 2020 contested hearing at which respondent appeared without representation, the trial court explained that the "basis for" the original restraining order issued in August 2017 "has been established" and was "res judicata." "That being said," the trial court continued, "the scope of that decision" *was* "before the [c]ourt." "I am most interested [in] the facts that have taken place since" August 2017, the trial court said. "That's of importance to the [c]ourt. And then, of course, I want to hear both from" respondent and appellant "on the seriousness of the underlying offense because that's a huge factor in determining whether there's a renewal."

4

*Appellant's testimony*

Appellant testified to her understanding of respondent's violations of the original restraining order.[2]

In June 2018, after "a hearing in the family court" at which "the judge ended up going with" respondent's position on a matter, he sent a "nasty e-mail" to appellant, who filed a police report, as he was prohibited from contacting her.

On three occasions in 2019, respondent violated the restraining order's provision that appellant had sole legal custody of daughter by "access[ing]" daughter's "health insurance to apparently get a therapist." Respondent didn't tell appellant, who "found out about it six months" later, when her health insurance refused "to cover . . . daughter's therapy." The reason for the refusal was that appellant "hadn't contacted th[e] specific therapist" that respondent "got the name of" when he contacted the health insurance.

On August 23, 2019, respondent was in the lobby of the building where they both worked, "staring at" appellant's friend "with a very angry look on his face." When appellant "walked over to the security desk" to explain that respondent "should not be in the lobby," he left the building. She filed a police report. On cross-examination, she

---

[2] Appellant also testified about respondent's two violations of a *temporary* domestic violence restraining order that she asserts the trial court issued before it issued the August 2017 restraining order. But the temporary restraining order is not in the appellate record. Appellant cites only to what appears to be a printout of the trial court docket (without an accompanying declaration regarding the document), which suggests that a temporary restraining order against respondent was issued in the case in May 2017.

Even if we accept the printout of the trial court docket as sufficient evidence that the trial court did issue a temporary domestic violence restraining order against respondent (cf. *Gilman v. Dalby* (2021) 61 Cal.App.5th 923, 940 ["whether the court's file contained [a document] and whether the court's website contained [the document] are two very different things"]), without the actual order detailing what respondent was prohibited from doing, appellant's testimony regarding her view of respondent's violations of the temporary restraining order is of very limited value on the question of respondent's *violations* of domestic violence restraining orders.

5

explained that she considered his conduct a violation of the restraining order, because he was only permitted to be on the first floor of the building "for work purposes, not to be loitering."

On August 29, 2019, appellant was shopping after work with her son when she saw respondent "across the street staring at [her] car." The two made eye contact. She "quickly got into [her] car," and respondent "g[ot] on his bike and le[ft]."

Appellant explained she was in therapy to help manage her posttraumatic stress disorder that resulted from the domestic violence she suffered.

Daughter had been seeing a therapist for posttraumatic stress disorder since January 2019. Daughter's posttraumatic stress disorder "and severe separation anxiety is unmanageable at times," appellant explained. She explained that respondent was violent with daughter on several occasions in 2016, when she was about two years old. The trial court observed: (i) daughter's therapist's notes (admitted into evidence as an exhibit) recounted respondent's acts of violence against daughter in 2016; (ii) it was a "fair assumption that [the therapist] would get his information from" appellant, given daughter's young age; and, (iii) appellant did not detail respondent's 2016 violence against daughter in her 2017 request for the domestic violence restraining order (which the trial court said it reviewed before the October 2020 hearing). Appellant explained that her attorney at the time "told [her] to focus solely on the inciden[ts] where [respondent] was abusive towards" her, but his violent conduct towards daughter was raised "verbally . . . at the restraining order" hearing.[3]

---

[3] A transcript of the August 2017 hearing on appellant's request for a domestic violence restraining order was not provided to the trial court in connection with the October 2020 hearing on her renewal request. Nor is a transcript of the August 2017 hearing in the record on appeal.

6

Appellant presented evidence of her injuries from the incident that occurred during the June 2016 family trip to Lake Tahoe. She submitted photographs of bruises to her back, and a September 2020 "letter from [her] doctor" regarding her "lingering back pain."[4]

The trial court inquired whether appellant had "any medical records that objectively say that [she] was injured or suffers from a back injury," other than "self-reports[s] of injury and . . . pain." When her counsel referenced a doctor's report from December 2017, the trial court observed the document reflected appellant's "self-report." "[T]here aren't any records that show that a doctor has concluded through objective evidence," the trial court noted. "So that's the nature of the injury based on the records that have been submitted."

Appellant testified that she was still afraid of respondent.

On cross-examination by respondent, appellant agreed that the June 2018 e-mail (purportedly from respondent to her) that she referenced on direct examination, and which was admitted into evidence,[5] was "heard . . . and dismissed" by a different judge in 2019 (apparently at a hearing on criminal contempt charges against respondent). "You lied to the judge," appellant said, addressing respondent. "Just because the [c]ourt didn't find anything doesn't mean it's not true. You did this. You violated the restraining order."

With the trial court's permission, and while cross-examining appellant, respondent read from a transcript of the 2019 hearing, wherein the presiding judicial officer explained the ruling, and "question[ed] [the] veracity" of the 2018 e-mail purportedly

---

[4]    The letter explained that appellant was "being treated for back pain that began after an incident of domestic abuse in 2016."

[5]    The text of the e-mail provided, in part: "Haha you bitch! I got you today! You thought you could win? I told you I would make you pay!"

7

sent by respondent, given: (i) "evidence [appellant] engaged in . . . cyber hacking," by "access[ing]" respondent's e-mail account in the past; and, (ii) that appellant's "credibility was fairly successfully attacked at" the 2019 hearing. "Yes, this is what I was saying," appellant said, still on cross-examination, and responding to respondent's reading of the 2019 hearing transcript. "You lied."

*Appellant's therapist's testimony*

Appellant's licensed marriage and family therapist testified that he "spent a four-year internship working with victims of domestic violence and . . . male abusers," and appellant showed "patterns that [we]re indicative of" abuse. He believed she had posttraumatic stress disorder, and that her fear "h[u]ng[ ] over her like a shadow."

On cross-examination, the therapist testified that his first appointment with appellant was slightly more than two months before the hearing.

*Respondent's testimony*

Respondent "had no intent of harassing, stalking, [or] communicating with" appellant, who "fil[ed] false police reports accusing [him] of violating the restraining order." "She seems to file a report every time she sees me, and then exaggerates what actually happened," he continued. "I believe that she is using the restraining order to keep [daughter] away from me."

Respondent explained that he completed 52 weeks of anger management classes and had "attempted to participate in supervised visits and reunification therapy" with daughter; "voluntarily attend[ed]" an "outpatient drug and alcohol program" in April 2019; "completed a 13-week parenting class" in December 2018; and was "attending Alcoholics Anonymous."

He also explained that one of daughter's therapists testified at an earlier hearing that appellant made "false" allegations against the therapist (suggesting the therapist had touched daughter inappropriately). On cross-examination, respondent testified that the

8

therapist proactively contacted Child Protective Services (CPS) about appellant's allegation "to protect himself."

Appellant's counsel asked the trial court if appellant could testify again, solely on the issue of her allegations to CPS about the therapist. Implicitly declining counsel's request, the trial court said it would "accept th[e] offer of proof" that "CPS advised [appellant] not to take [daughter] to" that therapist anymore. "[T]hat wouldn't be unusual, even if" the allegations "weren't true, to say use a different therapist," the trial court observed.

Under questioning from the trial court, respondent denied being violent with daughter in 2016 (as recounted in daughter's therapist's notes). He also gave his version of the June 2016 incident during the family vacation at Lake Tahoe: "So that day we got in an argument. I wanted to be left alone. [Appellant] was persistent, and . . . very intoxicated. I asked for the keys to leave to get some space to decompress . . . . When she refused to give me the keys, I tried to grab them from her and I grabbed her arm. When I grabbed her arm, she yelled, Let me go. So when I let her go, she did stumble back into the wall and fell down. . . . I did not hit her."

Under further questioning by the trial court, respondent said that he was an alcoholic, and that his "clean date" was July 25, 2019, giving him "over a year of sobriety."

On cross-examination, respondent insisted that a bar tab of $150 from the day of June 2016 Lake Tahoe incident was for drinks that he and appellant *both* consumed.

C.    *The ruling*

At the end of the October 2020 hearing, the trial court denied appellant's request to renew the restraining order.

"I don't think there's any doubt" that appellant "subjectively fears for her safety," the trial court remarked when announcing its ruling. "The more difficult question for the [c]ourt or the more important question is whether her apprehension is reasonable under

9

the circumstances, and it is an objective test." There were no "medical records to support [posttraumatic stress disorder] other than a marriage family therapist's records that are conclusory," and "no objective evidence of a back injury" beyond "subjective report[s] of lower back tenderness," the trial court explained.

Further, there was "*no credible evidence* that [respondent] was ever violent against [daughter]. That wasn't in the initial restraining order allegation which form[ed] the basis of [the original] ruling." (Italics added.)

"So we have a father who has done a 52-week anger management class. He's done an outpatient treatment. He's acknowledged he's an alcoholic to the [c]ourt. He's indicated he's been in AA. He provided his clean and sober date. He provided certification of parenting classes.

"The incidents alleged since the issuance of the restraining order are incidental. The two parties work in the same building. *There's no credible evidence* to establish any sort of stalking or purposeful violations of the restraining order. These are all incidental crosses of paths, including one outside the art store.

"So there [was] *no evidence* before the [c]ourt *of a reasonable apprehension of fear*. And . . . *physical safety* [*was*] *the critical question* before the [c]ourt. When you look at the underlying incident, the underlying allegations, there was a single violent episode that occurred June 10th, 2016," which was "not likely to repeat itself. . . . And so without evidence of ongoing harassment and stalking, and without evidence that there is any fear -- excuse me, any objective fear, there[ ] [were] just no grounds to renew the restraining order . . . ." (Italics added.)

The original restraining order "served its purpose, and . . . there [was] not a reasonable apprehension of fear going forward."

The trial court emphasized that it "*did not* particularly find [appellant's] testimony . . . that *credible*. She makes allegations . . . that are clearly just incidental passings at

10

work or otherwise in the community that aren't stalking, and . . . *she is disassociated from reality*." (Italics added.)

Appellant timely appealed. (See *Isidora M. v. Silvino M.* (2015) 239 Cal.App.4th 11, 16, fn. 4 [restraining order is appealable as an order granting an injunction].)

DISCUSSION

Appellant contends the trial court "applied the wrong standards," thereby abusing its discretion, when it denied her request to renew the domestic violence restraining order. The trial court "misunderstood . . . the [relevant] statute," which does *not* require "fear of physical abuse or physical safety" in order to renew a domestic violence restraining order. Respondent did not file a brief in this appeal.

We find no abuse of discretion. The trial court did not apply the wrong standard. Rather, in denying the requested renewal, the trial court made credibility determinations to which we must defer.

I

We review for an abuse of discretion the trial court's order denying a request to renew a domestic violence restraining order. (*Ashby v. Ashby* (2021) 68 Cal.App.5th 491, 509 (*Ashby*).) If multiple inferences can be deduced from the facts, we may not substitute our decision for the trial court's. (*Ibid.*) The trial court's order " 'is presumed to be correct, and all intendments and presumptions are indulged to support it on matters as to which the record is silent. [Citation.] It is the appellant's burden to affirmatively demonstrate error. [Citations.]' " (*Ibid.*)

"Section 6345, subdivision (a), provides in relevant part, a [domestic violence restraining order] 'may be renewed, upon the request of a party, either for five years or permanently, *without a showing of further abuse* since the issuance of the original order . . . .' (Italics added.) In *Ritchie v. Konrad* (2004) 115 Cal.App.4th 1275, 1283 . . . , the [appellate court] resolved an issue of first impression by interpreting section 6345 to mean the renewal of the [restraining order] requires there is a reasonable

11

apprehension of future abuse if the initial order expires.  The court reasoned, '[S]ection 6345 makes it unnecessary for the protected party to introduce or the court to consider actual acts of abuse the restrained party committed after the original order went into effect.  It would be anomalous to require the protected party to prove further abuse occurred in order to justify renewal of that original order.  If this were the standard, the protected party would have to demonstrate the initial order had proved ineffectual in halting the restrained party's abusive conduct just to obtain an extension of that ineffectual order. . . .  But this does not suggest the trial court need make no finding beyond the petitioning party's subjective desire to have the existing protective order extended . . . .' (*Ritchie*[ *v. Konrad*]*, supra*, 115 Cal.App.4th at p. 1284.)" (*Ashby, supra*, 68 Cal.App.5th at pp. 509-510.)

"The [*Ritchie*] court ultimately held:  'We conclude that in California, as in the rest of the country, an objective test must be satisfied before a protective order is renewed in contested cases.  From the language of California statutes and the legislative history, we have drawn the following formula (limited, however, to cases where the restrained party appears and challenges the requested renewal of the existing order).  A trial court should renew the protective order, if, and only if, it finds by a preponderance of the evidence that the protected party entertains a "reasonable apprehension" of future abuse.  So there should be no misunderstanding, this does not mean the court must find it is more likely than not future abuse will occur if the protective order is not renewed.  It only means the evidence demonstrates it is more probable than not there is a sufficient risk of future abuse to find the protected party's apprehension is genuine and reasonable.' ([*Ritchie v. Konrad, supra*, 115 Cal.App.4th] at p. 1290.)

"The *Ritchie* court discussed factors the trial court should consider in applying this test.  (*Ritchie* [*v. Konrad*]*, supra*, 115 Cal.App.4th at p. 1290.)  The court stated the evaluation is different from deciding whether to issue the original order.  'For one thing, there is that existing order and the factual predicate for its issuance—typically prior acts

12

or at least threats of abuse, . . . or similar evidence of the restrained party's predisposition to inflict abuse, and the like. The existence of the order itself often will be less telling than the facts supporting its issuance. Consequently, the trial judge ordinarily should consider the evidence and findings on which that initial order was based in appraising the risk of future abuse should the existing order expire. [¶] . . . [T]he trial court should not permit the restrained party to challenge the truth of the evidence and findings underlying the initial order, as . . . [t]his would contradict principles of collateral estoppel and undercut the policies supporting those principles.' (*Ibid*.) It noted the prior protective order 'seldom if ever will provide *conclusive* evidence the requesting party entertains a "reasonable apprehension" of future abuse of any kind should that order expire.' (*Id*. at p. 1291.) However, 'the initial order certainly is relevant and the underlying findings and facts supporting that order often will be enough in themselves to provide the necessary proof to satisfy that test.' (*Ibid*.) The court added, 'Also potentially relevant are any significant changes in the circumstances surrounding the events justifying the initial protective order. For instance, have the restrained and protected parties moved on with their lives so far that the opportunity and likelihood of future abuse has diminished to the degree they no longer support a renewal of the order? Or have there been no significant changes or even perhaps changes that enhance the opportunity and possibility of future abuse?' (*Ibid*.) Finally, the court concluded the ' "burdens" the protective order imposes on the restrained party' in some cases can be relevant, but 'would never justify denial of a renewed protective order where the "reasonable apprehension" is of future acts of *physical violence*.' (*Ibid*.)" (*Ashby, supra*, 68 Cal.App.5th at pp. 510-511.)

"[V]iolation of the [original restraining order] can support a finding of reasonable apprehension. (See *Rybolt v. Riley* (2018) 20 Cal.App.5th 864, 875-876.) However, the reverse is not true." (*Ashby, supra*, 68 Cal.App.5th at p. 515.) Compliance with a restraining order does not preclude a finding of reasonable apprehension. (*Id*. at pp. 515-516.)

"Fear of physical abuse is not required to renew a restraining order. [Citation.] The [law] covers a myriad of conduct beyond mere physical abuse. Under section 6320, subdivision (a), for example, courts may enjoin stalking, threatening, harassing, telephoning, destroying personal property, contacting, either directly or indirectly, by mail or otherwise, coming within a specified distance of, or disturbing the peace of the other party." (*Rybolt v. Riley, supra*, 20 Cal.App.5th at p. 875.) Behavior that is "not physically threatening," may still "sufficiently disturbed [one's] peace and emotional well-being [such] that her apprehension of . . . future abuse [is] reasonable." (*Ibid*.)

## II

Recognizing the trial court properly articulated an " 'objective reasonableness' standard," for the question of her "subjective apprehension of future abuse," appellant contends the trial court erred by placing undue weight on considerations of her "physical safety," thereby indicating it "believed it had to find evidence of ongoing harassment and stalking to renew the restraining order." In that way, appellant contends, the trial court improperly "ignored much of what was in the initial application for the restraining order which had served as a basis for" the original order. We are not persuaded.

The record reflects the trial court was well-acquainted with appellant's May 2017 request for a domestic violence restraining order, as the trial court indicated it read that original request, and questioned appellant about material omissions in it (regarding respondent's alleged acts of violence against daughter). But, importantly, it appears the trial court did *not* have a copy of a transcript of the October 2017 hearing that led to the original restraining order, thereby limiting the probative value of the original order and allegations made in the application for the order. (Cf. *Ashby, supra*, 68 Cal.App.5th at p. 510 [Because " '[t]he existence of the order itself often will be less telling than the facts supporting its issuance . . . the trial judge ordinarily should consider the evidence and findings on which that initial order was based in appraising the risk of future abuse' "].)

The trial court explained that while it understood that the "basis for" the original restraining order was "res judicata," the question whether to renew the restraining order was a *new* question. (See *Ashby, supra*, 68 Cal.App.5th at pp. 510-511.) And on that question, the trial court (implicitly) found there were " 'significant changes in the circumstances surrounding the events justifying the initial protective order' " (*id.* at p. 511), such that renewal of the protective order was unwarranted. The trial court explained: "[W]e have a father who has done a 52-week anger management class. He's done an outpatient treatment. He's acknowledged he's an alcoholic to the [c]ourt. He's indicated he's been in AA. He provided his clean and sober date. He provided certification of parenting classes."

Further, the trial court made adverse credibility findings against appellant (concluding—in part because her allegations undergirding the requested renewal concerned "clearly just incidental" events—that she was "disassociated from reality") to which we must defer. (See *Ashby, supra*, 68 Cal.App.5th at pp. 517-518 [citing case law for the proposition that an appellate court "is required 'to defer to the court's credibility determinations and make all reasonable inferences in support of the court's findings' "]; *Rybolt v. Riley, supra*, 20 Cal.App.5th at p. 876 [appellant "fails to comprehend the barrier credibility findings present on appeal," as "[w]e do not substitute our opinion as to the credibility of the witnesses for that of the trial court"].) And because the trial court's ruling rested, in significant part, on that adverse credibility finding,[6] this is a significant barrier to appellant's appeal.

And while it is true the trial court remarked that "physical safety [was] the critical question before" it, such an approach was not so inconsistent with the case law as to amount to an application of an incorrect legal standard, as appellant contends. The case

---

**6**     The trial court stated multiple times that there was no *credible* evidence supporting appellant's request.

15

law recognizes that physical safety *is* an especially salient consideration in the context of requests for domestic violence restraining orders.  (Cf. *Rybolt v. Riley, supra*, 20 Cal.App.5th at p. 874 ["The seriousness and degree of risk, such as whether it involves *potential physical abuse . . .* [is a] . . . relevant consideration[ ]" (italics added)]; *Ritchie v. Konrad, supra*, 115 Cal.App.4th at p. 1292 [because "the *physical security* of the protected party trumps all of the[ ] burdens the original or renewed protective order may impose on the restrained party," if there is "a 'reasonable apprehension' of *future physical abuse* if the current protective order expires, that order should be renewed despite any burdens this inflicts on the restrained party" (italics added)].)

Appellant argues it is clear the trial court failed to correctly apply the "objective reasonableness standard," because "[n]othing in the [trial] court's statement of reasons shows that" it "considered whether a similarly situated domestic violence victim might have a similar apprehension of future abuse."  But this contention is unpersuasive for a least two reasons.

First, it ignores the relevant appellate burden.  We presume the trial court correctly applied the law, and it is an appellant's burden to demonstrate otherwise.  That burden is not met merely by asserting the *absence* of signals the trial court correctly applied the law.  (See *Ashby, supra*, 68 Cal.App.5th at p. 509 [appellant's burden to affirmatively demonstrate error, as a trial court order is presumed to be correct, and all presumptions are indulged to support it when the record is silent].)

Second, the ostensible error that appellant asserts does not fully capture the relevant substantive inquiry.  Whether a "similarly situated domestic violence victim" *might also* have had an apprehension of future abuse by respondent does not necessarily answer the question whether "the evidence demonstrates it is more probable than not there *is a sufficient risk* of future abuse to find the . . . apprehension . . . *reasonable*." (*Ritchie v. Konrad, supra*, 115 Cal.App.4th at p. 1290, italics added.)

Accordingly, we conclude the trial court did not abuse its discretion.

16

## III

Appellant also argues the trial court abused its discretion by denying renewal of the restraining order "to protect . . . daughter." But in light of our analysis above and the statutory scheme, this claim fails. Proper denial of *appellant's* request to renew the restraining order precluded renewal of a restraining order solely as to daughter.

A trial court may issue a domestic violence restraining order (and renew it) to protect the person who requests it, "*and*, in the discretion of the court, on a showing of good cause, of *other named family* or household members." (§ 6320, subd. (a), italics added; see § 6345 [renewal].) Here, in her original application, appellant named daughter. Section 6320's wording (i.e., its use of "and," not "or") indicates a legislative determination that "other named family" may be entitled to the protections of a restraining order only if the person requesting the restraining order obtains it. (Cf. *Kobzoff v. Los Angeles County Harbor/UCLA Medical Center* (1998) 19 Cal.4th 851, 861 ["The Legislature's use of the word 'and' shows it intended courts to construe in the conjunctive," as the " 'ordinary usage of "and" is to condition one of two conjoined requirements by the other, thereby causally linking them' "].)

Thus, because the trial court did not abuse its discretion by denying appellant's renewal request, it necessarily follows it did not abuse its discretion in denying the renewal request as to daughter, who was "other named family" on appellant's original application.[7]

---

[7] Our conclusion is not inconsistent with the granting of *independent* requests for restraining orders by other named family or household members. (Cf. *Riehl v. Hauck* (2014) 224 Cal.App.4th 695, 701 ["if a minor child is 'abused' as defined in section 6203, he or she is a protected person pursuant to section 6211, subdivision (e)," and an independent request for a restraining order "can be brought by a parent as the natural guardian of a minor child, [or] by a guardian ad litem appointed by the court"].)

DISPOSITION

The order is affirmed.

                        /s/

                    RAYE, P. J.

We concur:

   /s/

MAURO, J.

   /s/

HOCH, J.