Filed 9/25/23  Lester v. Parrish CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| ANDREA LESTER, | D081465 |
| Respondent, | |
| v. | (Super. Ct. No. 20FDV03459N) |
| SEAN PARRISH, | |
| Appellant. | |

APPEAL from order of the Superior Court of San Diego County, Daniel Segura, Judge.  Affirmed.

Shelly K. Pawchuk for Appellant.

Linda Cianciolo for Respondent.

Sean Parrish appeals from an order granting Andrea Lester's request to renew a domestic violence restraining order (DVRO) against him.  He contends that the trial court erred in granting the renewal because it failed to consider the underlying basis for the original order, the type of abuse that necessitated the order, and the change in circumstances since the order was issued.  Parrish further contends that the trial court improperly relied on Lester's subjective fear and that the renewal order is contrary to the purposes

of the Domestic Violence Prevention Act (DVPA). (Fam. Code, § 6200 et seq.)[1] We find no error and therefore affirm the order.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Request for DVRO*

Lester filed a request for a DVRO against Parrish on August 7, 2020. The trial court issued a temporary restraining order (TRO) the same day, and Parrish was ordered to vacate the couple's home (the Oceanside residence).

In support of her DVRO request, Lester submitted a declaration stating that she and Parrish had been in a relationship for 15 years and married for 13 years. Lester stated that on August 2, 2020, she informed Parrish that she wanted a divorce. Although he was initially understanding, the following day, Parrish became angry and verbally abusive towards Lester. He accused her of cheating, called her a "bitch" among other insults, and threatened to throw all of her belongings outside and force her out of their shared house, saying that he would continue his harassment until she "broke." Parrish also told Lester that he had trackers on her car and phones and that he was hiring a private investigator to follow her. Lester stated that this harassing behavior—which included threatening to ruin her life, demanding access to her iPad and cell phone, and refusing to leave her alone despite her repeated requests—continued on and off over the next few days.

Parrish's actions caused Lester to fear for her safety, and on August 6, she purchased a door bar to secure the spare bedroom where she was sleeping at night, as it did not have a lock. Later that afternoon, Parrish contacted Lester's mother. According to Lester, Parrish told her mother that Lester was cheating on him, that he was going to ruin Lester's life and "make this as ugly and hard as possible," and called Lester "all sorts of slurs and

---

[1]     Undesignated statutory references are to the Family Code.

2

derogatory names." Lester said her mother called her and was hysterical and scared for Lester's safety, begging her not to go home after work. Lester followed her mother's request and rented a hotel near work.

That same night, Lester received a series of text messages from Parrish saying that if she did not answer his calls, he would throw all of her clothing, jewelry, personal files, and paperwork in the driveway. Lester drove home and saw all of her clothes in the driveway with a sign attached to her suitcase that said "GET OUT CheATER." She called law enforcement and requested an escort to the house to retrieve her belongings. After law enforcement officers arrived and spoke with Parrish, Lester began gathering her belongings and noticed they were wet and smelled strongly of chemicals. Parrish initially lied about his involvement but then admitted to the officers that he had doused everything in WD-40, an accelerant. The responding officers filed a crime report and advised Lester to file a restraining order the next morning. Lester stayed at the hotel that night and filed her DVRO request the next day.[2]

B. *Hearing and Ruling on DVRO Request*

The trial court held a hearing on the matter on October 21, 2020. The court heard testimony from Parrish, Lester, Lester's mother, the officer who responded to the August 6 incident, and Parrish's friend.

In addition to the events described in her declaration, Lester testified that Parrish had violated the TRO. After she obtained the TRO, she changed the code used to disarm the alarm system for the Oceanside residence. On September 10, she received an email from the security company saying that Parrish had contacted the company multiple times to request access to the

---

[2] The record does not contain any written response from Parrish to the DVRO request.

3

security system, the new code, and the camera system at the house.  The company forwarded two emails to Lester.  In the September 10 email from Parrish to the company, he states:  "I go to court on the 18 this month and there [*sic*] going to deny the restraining order my wife is trying to get.  What info do you need so I can get the alarm code on that day.  I don't want to set the alarm off."  On cross-examination by Lester's counsel, Parrish admitted that he had contacted the security company for the Oceanside residence in an attempt to gain access to the house on August 30 and September 10.  During her testimony, Lester said that learning of Parrish's attempt to access the house "was very disturbing" and "literally made [her] sick."

Lester further testified that Parrish had "been threatening to destroy [her] and ruin [her] life" and that she feared he would physically harm her.  When the trial court judge asked Lester why she felt she needed a restraining order to remain in place against Parrish to protect her, Lester replied:  "He had been threatening all week to throw me out, force me out, surveillance [*sic*] me, ruin my life, destroy me, hurt me, make this as hard as possible.  And by Thursday, it wasn't just cycling through emotions and words.  He was making good on his threats.  And I feel like if I hadn't had the police show up with me, I don't -- I don't know what he would've done had I come along to try to get my things up out of the street.  I feel like he would've lit them up in my face.  I don't think it's safe for him to be able to be around me.  I don't think he's done."

Lester's mother, Sharon L., also testified in support of Lester.  She stated that when she spoke with Parrish on the phone on August 6, he called Lester a "lying, cheating whore" and other "bad names," told Sharon that he "was going to ruin" and "destroy" Lester and "take her for everything" she had, and admitted he had gone to Lester's friend's house looking for Lester.

4

Sharon immediately called Lester because she was scared for her safety and asked her not to go home. Sharon further testified that, as of the day of her testimony, she still had concerns that Parrish would hurt Lester.

Parrish's friend, Carlos V., testified that he had overheard part of Parrish's phone conversation with Sharon. Carlos stated that Parrish did not call Lester any names; Parrish told Sharon that he was worried about Lester; and Parrish and Sharon both cried during the conversation and said, "I love you" and "I'm sorry" to each other.

Parrish testified that he was very hurt and surprised when Lester asked for a divorce, that he did not call her any names other than a "cheater," and he did not verbally harass her but rather "spoke [his] piece" and tried to change her mind about the divorce. He further testified that he was not upset during his phone call with Sharon and that his only purpose in calling her was to inform her of his "concern" for Lester and her well-being.

The trial court found Lester and her mother Sharon credible regarding Sharon's "disturbing" phone call with Parrish, and found that Parrish was not credible regarding that incident. The court also found Parrish's explanation for spraying WD-40 on all of Lester's clothes—that he believed the clothes were community property—to be "total[l]y lacking in credibility." Instead, the court found that Parrish's purpose was to hurt Lester and destroy her peace of mind, that his actions would cause a reasonable person great fear, and that Lester was in fact fearful of what Parrish would do. The court therefore granted the restraining order request. The court issued an amended order granting Lester's DVRO request on October 23, 2020, ordering Parrish to stay away from Lester for approximately 18 months, until April 20, 2022. The order also required Parrish to take anger management classes.

5

C.  *Request for Renewal of DVRO*

Lester filed a request for permanent renewal of the DVRO on March 29, 2022.  In support, she submitted a four-page declaration stating that she remained fearful of Parrish.  Lester alleged that Parrish had violated the DVRO by continuing to monitor her activity via his friend Carlos, who worked for the homeowners association for the Oceanside residence and had testified in support of Parrish at the DVRO hearing.  She also alleged that Parrish had contacted her father.

Parrish submitted an opposition and responsive declaration.  These documents are not in the appellate record.

The trial court held a hearing on Lester's renewal request on April 15, 2022, which was ultimately continued to and concluded on November 10, 2022.  Lester and Parrish both testified.

Lester testified that she requested a renewal of the DVRO because she was "afraid of [Parrish] and what he might do when there's no protection in place."  She further testified that she was concerned Parrish had been soliciting information about her since the DVRO was issued.  Parrish included a statement in his mandatory settlement conference brief in the parties' dissolution action that he believed Lester had a new car.  Lester did not have a new car but did have someone who had been staying at her house and parking in her driveway.  She also testified that Carlos flagged her down outside her house one morning to ask her questions about her relationship status and about Parrish.  Lester stated:  "I just know that Sean wants to hurt me.  And he didn't -- he didn't get to finish what he did, and he's just been waiting to not have any orders against him."  When asked what would happen if the DVRO renewal request was not granted, Lester stated:  "It's hard to say."

6

Parrish denied knowing whether Lester had a new car and further testified that he did not ask Carlos to contact Lester and that Carlos did not tell him she had a new car or a boyfriend. He stated that he did not know why his attorney included a reference to Lester having a new car in his mandatory settlement conference brief. Parrish testified that he now lived approximately 50 minutes away from Lester and an hour from her work, that the former couple had no friends in common, and that he has a new girlfriend.

The trial court determined that Lester established that she had a reasonable apprehension of future abuse by Parrish and renewed the restraining order for a five-year period. In making its ruling, the court relied mainly on the underlying events necessitating the original restraining order and Lester's testimony as to how those events had affected her and her continued fear of Parrish, which the court found credible.

Parrish timely appealed.

## DISCUSSION

A. *Standard of Review and Governing Law*

The DVPA authorizes trial courts to issue a restraining order against someone "to prevent acts of violence, abuse, and sexual abuse and to provide for a separation of the persons involved in the domestic violence for a period sufficient to enable these persons to seek a resolution of the causes of the violence" (§ 6220) if it finds there is reasonable proof of a past act or acts of abuse. (§ 6300.) Section 6345, subdivision (a) provides that the initial DVRO shall last no longer than five years, but it "may be renewed, upon the request of a party, either for five or more years, or permanently, at the discretion of

7

the court, without a showing of further abuse since the issuance of the original order."

The legal standard for a DVRO renewal "is whether the protected party entertains a reasonable apprehension of future abuse." (*Michael M. v. Robin J.* (2023) 92 Cal.App.5th 170, 179 (*Michael M.*).) "[T]his does not mean the court must find it is more likely than not future abuse will occur if the protective order is not renewed. It only means the evidence demonstrates it is more probable than not there is a sufficient risk of future abuse to find the protected party's apprehension is genuine and reasonable." (*Ritchie v. Konrad* (2004) 115 Cal.App.4th 1275, 1290 (*Ritchie*).) In making this determination, "the trial judge ordinarily should consider the evidence and findings on which that initial order was based in appraising the risk of future abuse should the existing order expire." (*Ibid.*) "Also potentially relevant are any significant changes in the circumstances surrounding the events justifying the initial protective order. For instance, have the restrained and protected parties moved on with their lives so far that the opportunity and likelihood of future abuse has diminished to the degree they no longer support a renewal of the order?" (*Id.* at p. 1291.) Any " 'burdens' " the DVRO imposes on the restrained party "may or may not be a relevant factor in the trial court's consideration" of the renewal request. (*Ibid.*)

We generally review a ruling on a DVRO renewal request for abuse of discretion. (*Perez v. Torres-Hernandez* (2016) 1 Cal.App.5th 389, 396 (*Perez*).) An abuse of discretion occurs when the trial court's ruling " 'exceeds the bounds of reason.' " (*Ibid.*) "To the extent that we are called upon to review the trial court's factual findings, we apply a substantial evidence standard of review." (*Loeffler v. Medina* (2009) 174 Cal.App.4th 1495, 1505.) This standard is "generally considered the most difficult standard of review to

meet, as it should be, because it is not the function of the reviewing court to determine the facts." (*In re Michael G.* (2012) 203 Cal.App.4th 580, 589.)

B. *Analysis*

Parrish first contends that the trial court abused its discretion in granting Lester's request for renewal of the DVRO because the court purportedly failed to consider certain required factors in making its ruling. Specifically, Parrish argues that the court failed to consider the facts and evidence on which the DVRO was issued, the change in circumstances of the parties since the DVRO was issued, and the type of abuse that occurred. We find these arguments without merit.

Parrish's first contention—that it is "obvious," given the original court's findings in support of the initial DVRO, that the renewal court either failed to review the transcript of the original hearing or ignored the findings of the original court—is easily refuted by the record. The trial court was plainly aware of the findings made in support of the initial DVRO, noting in its ruling that the original court "found that both Ms. Lester's credibility and her mother's testimony were creditable [*sic*], and that Mr. Parrish's testimony was not so credible." Indeed, the trial court based its renewal ruling in large part on the underlying findings, explaining: "I believe that the underlying facts of the case are sufficient, but I'm taking into consideration also [Lester's] credibility now" as to her fear of Parrish. The court found that Lester was credible in testifying that she remains in fear of Parrish due to the events that occurred in 2020, "because of the messages that were sent [by Parrish] and the fact that he put her clothes out the way he did, and the fact that he put WD-40 on them[.]" The court explained that such "behavior makes people really, really afraid in a reasonable way."

9

As the trial court correctly noted, "the underlying reason for the restraining order in itself is enough to renew if the court makes the finding that the person is reasonably still in fear." (See *Ritchie, supra,* 115 Cal.App.4th at p. 1291 ["the underlying findings and facts supporting that order often will be enough in themselves to provide the necessary proof to satisfy that test" of reasonable apprehension of future abuse].) The trial court correctly considered and relied on the underlying facts of the DVRO as well as Lester's testimony at the renewal hearing to conclude that she continued to have a reasonable apprehension of future abuse. (*Michael M., supra,* 92 Cal.App.5th at p. 184 [concluding that the trial court erred in denying renewal request on the ground that no abuse had occurred since issuance of the DVRO and that petitioner had established a reasonable apprehension of future abuse.].)

We also reject Parrish's argument that the trial court abused its discretion by failing to consider the parties' changed circumstances when granting the renewal. Parrish emphasizes that, since the DVRO was issued, the parties have entered a marital settlement agreement, they live and work around an hour away from each other, they have no friends in common, and Parrish has a new girlfriend. According to Parrish, this evidence shows that the parties have moved on. He cites *Ritchie* for the proposition that a court "must" consider such changes in circumstances when evaluating whether a protected party has a reasonable apprehension of future harm. But the court in *Ritchie* explained that such significant changes are only "potentially relevant"—not factors that must be considered or treated as dispositive. (*Ritchie, supra,* 115 Cal.App.4th at p. 1291.) Nothing required the trial court to place any particular weight on the change in circumstances identified by Parrish. In the absence of any showing to the contrary, we presume that the

10

trial court properly considered all relevant factors in making its renewal order.  (See *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133 ["A judgment or order . . . is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness"].)

For several reasons, we are not persuaded by Parrish's argument that the trial court improperly failed to take into consideration the type of abuse at issue.  First, although Parrish focuses on the fact that he did not physically abuse Lester, abuse need not be physical or violent to warrant the renewal of a DVRO.  (§ 6345, subd. (a); see *In re Marriage of Nadkarni* (2009) 173 Cal.App.4th 1483, 1495–1496.)  Nor is the protected party required to show a reasonable apprehension of future *physical* abuse.  (*Michael M.*, *supra*, 92 Cal.App.5th at p. 179; *Eneaji v. Ubboe* (2014) 229 Cal.App.4th 1457, 1462.)  The DVPA defines "abuse" broadly to include any behavior that could be enjoined under section 6320, including harassing or disturbing the peace of the other party.  (§ 6203, subd. (a); § 6320, subd. (a).)

Second, "[t]he key consideration for the [renewal] court *is not the type or timing of abuse*, but whether the protected party has a reasonable fear of future abuse."  (*Perez*, *supra*, 1 Cal.App.5th at p. 397, italics added [concluding that the trial court erred by denying a DVRO renewal request on the ground that there was no evidence of further abuse after its issuance].)  The original court here found that, after the TRO was issued, Parrish attempted to gain access to the alarm and camera system at the Oceanside residence "so he could monitor what was going on."  Parrish falsely informed the security company that the court was going to deny Lester's restraining order request and that he needed the alarm code and access to the security system in anticipation of the denial so he could immediately access the home when the TRO expired.  It is reasonable that Lester would fear that Parrish

11

had the same intent if and when the DVRO expired, and that he would continue to harass her and "finish what he [started]" before the DVRO was issued. Lester testified at the renewal hearing that she did have such a fear, stating she was "afraid of [Parrish] and what he might do when there's no protection in place. . . . [¶] . . . [¶] I just know that Sean wants to hurt me. And he didn't -- he didn't get to finish what he did, and he's just been waiting to not have any orders against him. And even earlier today, you know, he's got this date memorized. He says, I have to be good -- I have to obey the law until December 13th. Then what?" Lester's testimony was sufficient to establish a reasonable apprehension of future abuse.

Parrish next contends that the trial court erred in finding that Lester's subjective fear alone was sufficient to grant the renewal request. Again, this argument is refuted by the record. The trial court repeatedly and correctly stated that the standard for renewal was whether Lester proved by a preponderance of the evidence that she had a *reasonable* apprehension of future abuse. In fact, when Lester's counsel argued (incorrectly) at the outset of the November 10, 2022 hearing that the law does not require the court to determine whether the fear is reasonable, the trial court rejected her argument. The court explained: "Well, no, it's not that it's just their subjective [fear]. It can't be, I'm still afraid, therefore granted."

In making its ruling, the trial court considered the underlying events that necessitated the DVRO as well as Lester's continued fear of Parrish and concluded that Lester was credible and that it "is reasonable for her to feel and think that way[.]" The court expressly stated that "a reasonable person in the same circumstances, would continue to have that [fear] because it's behavior that, although not directly violent towards her, demonstrates an

12

attempt at intimidation and control over that other person . . . ." Nothing more is required.

Parrish's final argument is that the renewal of the DVRO against him is contrary to the purpose of the DVPA. According to Parrish, the trial court's renewal of the DVRO in this case does not act to prevent further harm to Lester but instead merely punishes Parrish. He does not explain how the renewal operates as a punishment, but instead repeats his prior arguments—that the trial court improperly ignored the underlying findings and the type and scope of abuse, failed to consider mitigating factors in Parrish's favor, and focused only on Lester's subjective feelings. Parrish's contentions essentially boil down to the fact that he does not agree with the trial court's conclusion and believes his evidence was more persuasive than Lester's. This is not sufficient reason for reversal, and we decline Parrish's implicit invitation to reweigh the evidence. (See *In re S.A.* (2010) 182 Cal.App.4th 1128, 1140 ["Issues of fact and credibility are questions for the trial court. [Citations.] It is not an appellate court's function, in short, to redetermine the facts."], internal quotation marks omitted.)

As we have explained, the trial court had a sufficient basis to find that Lester had a reasonable apprehension that Parrish would continue harassing her and/or disturbing her peace if the DVRO was not renewed. We therefore conclude that the court did not err in granting the renewal.

13

## DISPOSITION

The order is affirmed.  Respondent is awarded costs on appeal.


                                                    BUCHANAN, J.

WE CONCUR:



McCONNELL, P. J.



O'ROURKE, J.